JOHN W. ADAMS, Plaintiff-Appellant, v. SUSSMAN AND HERTZBERG, LTD., *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—95—2801

Opinion filed August 27, 1997.

Friedman & Holtz, P.C., of Chicago (Gregory A. Friedman and Evdoxia Beroukas, of counsel), for appellant.

Alholm & Monahan, of Chicago (Peter A. Monahan, Linda J. Hay, and Patricia M. Noonan, of counsel), for appellee Sandra Hertzberg.

Hinshaw & Culbertson, of Chicago (George W. Spellmire, Jr., Stephen R. Swofford, Caroline A. Mondschean, and Christine L. Olson, of counsel), for other appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff brought this legal malpractice action to recover damages allegedly occasioned by the defendants' negligence in failing to prosecute plaintiff's lawsuit against Hertz corporation and a Hertz employee for intentional infliction of emotional distress, malicious prosecution, and defamation. At trial, the defendants admitted their breach of duties but contended that the plaintiff could not establish that he would have been successful in proving his claims in the underlying action. At the conclusion of trial, the jury returned a general verdict against the defendants in the amount of $300,000.

The defendants filed a motion for judgment notwithstanding the verdict. The trial court granted the motion with respect to plaintiff's underlying claim of intentional infliction of emotional distress and plaintiff's claim for punitive damages but denied the motion with respect to plaintiff's claims for malicious prosecution and defamation, ordering instead that a new trial be granted on those claims. Plaintiff filed a petition for leave to appeal pursuant to Supreme Court Rule 306(a)(1) (155 Ill. 2d R. 306(a)(1)), which was granted by this court.

The issues raised by the plaintiff in this appeal are: (1) whether the plaintiff established his underlying claim for intentional infliction of emotional distress; (2) whether the plaintiff was entitled to punitive damages in the attorney malpractice action where those damages were recoverable in the underlying action; and (3) whether the trial court erred in vacating the judgment in its entirety and ordering a new trial. The defendants argue pursuant to Supreme Court Rule 306(a) that the trial court erred in failing to grant judgment notwithstanding the verdict on plaintiff's underlying claims for malicious prosecution and defamation.

■ In a legal malpractice action, a plaintiff must prove the existence of an attorney-client relationship; a duty arising from that relationship; a proximate causal relationship between the breach of

duty and damages sustained; and actual damages. *E.g., Glass v. Pitler,* 276 Ill. App. 3d 344, 657 N.E.2d 1075 (1995). Damages are not presumed; the plaintiff must affirmatively plead and prove that he suffered injury as a result of the attorney's malpractice. *Glass,* 276 Ill. App. 3d 344, 657 N.E.2d 1075; *Sheppard v. Krol,* 218 Ill. App. 3d 254, 578 N.E.2d 212 (1991). Where the attorney's negligence is alleged to have occurred during the attorney's representation of the client in an underlying action that never reached trial because of that negligence, the plaintiff is required to prove that but for the attorney's negligence he would have been successful in that underlying action. *Sheppard,* 218 Ill. App. 3d 254, 578 N.E.2d 212; *Dunavan v. Calandrino,* 167 Ill. App. 3d 952, 522 N.E.2d 347 (1988). As a result, the malpractice plaintiff is required to prove a case within a case, that is, the plaintiff is required to prove the underlying action and what his recovery would have been in that prior action absent the alleged malpractice. *Glass,* 276 Ill. App. 3d 344, 657 N.E.2d 1075; *Nika v. Danz,* 199 Ill. App. 3d 296, 556 N.E.2d 873 (1990).

The evidence presented by the plaintiff in support of his underlying lawsuit against Hertz corporation and the Hertz employee for intentional infliction of emotional distress, malicious prosecution and defamation is as follows.

On March 10, 1979, the plaintiff, an IBM employee, was driving an automobile that had been leased from defendant Hertz corporation by another IBM employee, Sharon Kendall, who had been in Chicago on business. At approximately 6 p.m., the plaintiff was stopped by a Chicago police officer, Alan Lucas, because the license plates on the rental vehicle had expired. Lucas testified that the plaintiff told him that the automobile was leased and that he did not have a copy of the lease agreement with him. Lucas ran a name and vehicle check and, after being advised that the plaintiff was wanted on traffic warrants, arrested the plaintiff. Lucas stated that the plaintiff then told him that the automobile was leased by a friend who let him use it. He stated that the plaintiff's arrest on the street was based solely on the outstanding traffic warrants. Lucas testified that, upon arriving at the police station, he contacted Hertz security manager, Ronald Dziagwa, and confirmed that the vehicle belonged to Hertz and that it had not been reported stolen. Lucas stated that, after his conversation with Dziagwa, Lucas charged the plaintiff with criminal trespass to vehicles, the traffic violation, and the traffic warrants.

On cross-examination, Lucas stated that he issued two traffic citations to the plaintiff; one dealt with restrictions on the back of plaintiff's driver's license and the other dealt with the display of

registration plates and stickers. He stated that he became suspicious of the plaintiff when the plaintiff did not produce a rental agreement and because the plaintiff gave conflicting accounts of who had leased the vehicle. Lucas testified that the plaintiff first told him that he had rented the car and after being told that he was under arrest the plaintiff told him that his friend had leased the car. He admitted that his police report only said that the plaintiff said the car was rented from Hertz. Lucas did not recall what he told Dziagwa but stated that he probably told Dziagwa that the plaintiff told him that his friend rented the car.

Ronald Dziagwa testified that he received a telephone call from Officer Lucas. Lucas told him that the plaintiff had been stopped driving a Hertz automobile with expired license plates. He also told him that the plaintiff initially stated that the car belonged to a friend; that there was no rental agreement in the car; and that there was not a valid driver's license. Lucas did not tell him that the plaintiff was an IBM employee or that the plaintiff had given the police his IBM identification card. Dziagwa testified that he contacted the O'Hare Hertz office and was told that Sharon Kendall, an IBM employee, had used a "Company I.D." to lease the automobile on February 11, 1979, and was to return the vehicle on February 14, 1979. After Dziagwa unsuccessfully attempted to contact Kendall, he telephoned Lucas and authorized him to sign a complaint on Hertz's behalf charging the plaintiff with criminal trespass to motor vehicles, a misdemeanor.

Dziagwa testified that Kendall returned his telephone call at 8:30 p.m., eastern standard time, and that she told Dziagwa that she had given the car to the plaintiff. After talking to Kendall, Dziagwa telephoned Lucas and told him to "be ready for trouble on this one." He did not discuss with Lucas the possibility of withdrawing the complaint. He stated that, at the direction of his superiors, he never signed the complaint and never appeared in court. Dziagwa did not personally advise the plaintiff that Hertz would not proceed with the prosecution because "that was between [the plaintiff] and somebody else." It was Dziagwa's understanding that someone had spoken to the plaintiff about dropping the charges.

On cross-examination, Dziagwa stated that, when he received the telephone call from Officer Lucas, Lucas told him that the plaintiff was under arrest for some other charge. Lucas also told him that there was no rental agreement in the car. When asked whether he was told about any violations of the restrictions on the plaintiff's driver's license, Dziagwa testified that he thought the officer told him that the plaintiff did not have a valid driver's license. He stated that

if a person does not have a valid driver's license or if a person operates a Hertz vehicle in violation of his license restrictions, he would be driving in violation of the Hertz rental agreement and would be considered an unauthorized user.

Kendall testified by evidence deposition that she leased an automobile from Hertz on February 11, 1979, for one day. On February 12, 1979, she returned to her residence in Boston and gave the automobile to the plaintiff because he needed it for business purposes but did not notify Hertz as to the change. Kendall also testified that on March 10, 1979, she received a message to call Dziagwa regarding plaintiff's arrest in relation to a Hertz rental car and that at approximately 8:30 eastern standard time she spoke with Dziagwa, who told her to call Officer Lucas.[1] After her conversation with Lucas, Kendall telephoned Dziagwa. During that conversation, Dziagwa told Kendall that he was not going to let the plaintiff go and, for his reasons, he referred to plaintiff's "license plates, the warrant out for his arrest, and past offenses in other places along with cars, something to do with car theft."

Kendall also testified that she had several conversations with a man named Mr. Remy, who was a manager at Hertz. Remy promised to get the situation straightened out and told her that "the charges would be cleared up" as soon as the plaintiff would come to his office and show his IBM identification. Kendall further testified that the only people she talked to about the incident and Dziagwa's statements were the plaintiff's mother and sister. Kendall stated that after the incident she did not feel differently about the plaintiff and her respect for the plaintiff never changed.

The plaintiff testified that on March 10, 1979, he was stopped by two police officers who told him that he was driving an automobile with expired license plates. He stated that he told the officers that he did not know the plates were expired because the automobile was a rental car from Hertz. He also told them that Sharon Kendall had rented the car and had given it to him to use while his personal automobile was being repaired. The plaintiff testified that he provided the officers with his driver's license and with his IBM identification card. He stated that the police returned to their car, talked on the radio, and then arrested him for criminal trespass to a motor vehicle. The plaintiff stated that, after his arrest, he was handcuffed, photographed, fingerprinted, shuttled to two police stations, inter-

---

[1]It is unclear from Kendall's testimony whether she told Dziagwa or Lucas that the plaintiff was an authorized user, that she and the plaintiff were IBM employees, and that there should be no problem.

rogated and incarcerated through the night until he was released on bail on Sunday, March 11, 1979. When questioned concerning his reaction to his arrest and incarceration, he stated that he was afraid and fearful about his career and what his colleagues, friends and loved ones would think and hear about his being charged with a criminal act that he did not commit. He stated that he cried when his mother arrived at the police station to post bail. The plaintiff testified that he was unable to give a major presentation the following Monday because his slides and presentation materials were in the confiscated Hertz automobile. He stated that he was forced to take time off from work to attend the court hearing with respect to the criminal charges and that he had to tell his immediate supervisor, Booker Daniels, about his arrest.

The plaintiff testified concerning his job mobility and the awards and recognition he received as an IBM employee. He stated that, a month after his arrest, he was asked by his immediate supervisor, who knew about the arrest, to resign as a marketing manager and be put on an "improvement plan." He refused and was moved into a lateral position at a smaller office which generated less revenue and thereafter, during the 13 years that he remained at IBM, was never given the opportunity to be in a significant, high visibility job at IBM. On cross-examination, the plaintiff admitted that his salary increased regularly beginning with a monthly salary of $600 in 1975; $1,654 in 1978; $1,935 in 1980; $4,950 in 1986, and $6,795 in 1991 when he left IBM.

Plaintiff's immediate supervisor and an IBM branch manager, Booker Daniels, testified concerning plaintiff's performance at IBM. He stated that the plaintiff was "rookie of the year for the district" in 1975. According to Daniels, the plaintiff did not follow the normal career path. He did not "go to the normal staff assignment" after working as a marketing representative and instead was promoted directly to a marketing manager position in 1978. With respect to a written evaluation prepared on the plaintiff in January 1979, before the March 10, 1979, incident, Daniels stated that he considered plaintiff's first-year performance as a marketing manager to be acceptable; that the plaintiff needed to improve in the area of engendering trust in leadership; and that the plaintiff exceeded his goal requirements and received high evaluations with respect to quota and actual sales achievements on the written evaluation prepared in January 1979. Daniels admitted that the plaintiff's performance as marketing manager was not as successful as it was when he was a sales representative. Daniels explained that, as a marketing manager, the plaintiff had a "slow start" in the performance category of "rap-

port and relationship with administration"; that the plaintiff's time response to customer complaints needed improvement; and that the plaintiff was given the lowest acceptable rating in the management and personnel responsibilities category. Daniels testified that the plaintiff's performance did not improve after the January 1979 evaluation as was required.

Daniels stated that he did not consider the March 10 incident in his evaluation of plaintiff's job performance. He stated that the incident was not reported in plaintiff's personnel file at IBM. In his opinion, the event did not damage the plaintiff's reputation.

The plaintiff's complaint in the underlying action against Hertz and Dziagwa, which was dismissed on December 16, 1985, for failure to comply with discovery orders, sought compensatory damages in the amount of $300,000 for intentional infliction of emotional distress; $350,000 for the wilful violation of plaintiff's constitutional rights; $750,000 for defamation; $250,000 for false imprisonment; $50,000 for conversion; $305 for lost income; $500 for restitution of attorney fees; and $750,000 in punitive damages. During the pendency of the instant malpractice action and pursuant to defendants' motion, the trial court granted summary judgment in defendants' favor as to several of plaintiff's underlying claims, leaving for trial the claims of intentional infliction of emotional distress, defamation and malicious prosecution. As punitive damages were recoverable with respect to the claims for malicious prosecution and defamation, the trial court refused to strike that request for relief and the malpractice action proceeded to trial. At the conclusion of plaintiff's case, the defendants moved for a directed verdict. That motion was denied. At the conclusion of trial, the jury returned a general verdict in plaintiff's favor in the amount of $300,000. The court then granted defendants' motion for judgment notwithstanding the verdict with respect to plaintiff's claims for intentional infliction of emotional distress and for punitive damages and granted a new trial on the claims for malicious prosecution and defamation.

Disposition of the instant appeal requires that we first consider whether judgment notwithstanding the verdict was proper with respect to plaintiff's underlying intentional infliction of emotional distress claim and then whether judgment notwithstanding the verdict should have been entered with respect to plaintiff's underlying claims for malicious prosecution and defamation. If the evidence at trial was sufficient to support either of the latter two claims, then we must address the issue of whether punitive damages recoverable under those claims can be recovered as compensatory damages in this attorney malpractice action. Finally, we must determine whether

the general verdict returned in the instant case should have been set aside and a new trial ordered when judgment on some but not all of the underlying claims was vacated.

## I. Intentional Infliction of Emotional Distress

██ █ The trial court's grant of judgment notwithstanding the verdict is proper only when all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *E.g., Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504 (1967); *Kennan v. Checker Taxi Co.*, 250 Ill. App. 3d 155, 620 N.E.2d 1208 (1993). To prove a cause of action for intentional infliction of emotional distress, the plaintiff must establish three elements: (1) extreme and outrageous conduct; (2) intent or knowledge by the actor that there is at least a high probability that his or her conduct would inflict severe emotional distress and reckless disregard of that probability; and (3) severe emotional distress. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 360 N.E.2d 765 (1976); *Knysak v. Shelter Life Insurance Co.*, 273 Ill. App. 3d 360, 652 N.E.2d 832 (1995); *Hearon v. City of Chicago*, 157 Ill. App. 3d 633, 510 N.E.2d 1192 (1987). Extreme and outrageous conduct sufficient to create liability for intentional infliction of emotional distress is defined as conduct that exceeds all bounds of human decency and that is regarded as intolerable in a civilized community. *Public Finance Corp.*, 66 Ill. 2d 85, 360 N.E.2d 765; *Khan v. American Airlines*, 266 Ill. App. 3d 726, 639 N.E.2d 210 (1994). The tort does not extend to " 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' " (*McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806 (1988), quoting Restatement (Second) of Torts § 46, Comment *d*, at 73 (1965)); and the infliction of such emotional distress as fright, horror, grief, shame, humiliation and worry is not sufficient to give rise to a cause of action. The emotional distress required to support the cause of action must be so severe that no reasonable person could be expected to endure it. *Public Finance Corp.*, 66 Ill. 2d 85, 360 N.E.2d 765. See generally Restatement (Second) of Torts § 46, Comment *j*, at 77 (1965). The intensity and the duration of the distress are factors to be considered in determining its severity. *Lundy v. City of Calumet City*, 209 Ill. App. 3d 790, 567 N.E.2d 1101 (1991).

██ In the instant case the plaintiff failed to prove severe emotional distress. There is no doubt that the plaintiff suffered shame, humiliation and worry as a result of Hertz's request that the plaintiff be charged with criminal trespass to vehicles. In this regard, we first note that the plaintiff presented no evidence to show that the

processing that occurred at the police station was the result of the charge brought by Hertz rather than the result of his arrest based upon the outstanding warrant. Moreover, even if it could be attributable to the Hertz charge, the type of emotional distress suffered by the plaintiff does not support a claim for intentional infliction of emotional distress. Actionable distress is that which is so severe that no reasonable person could be expected to endure it. See *Public Finance*, 66 Ill. 2d 85, 360 N.E.2d 765; *Khan*, 266 Ill. App. 3d 726, 639 N.E.2d 210 (recurring nightmares and problems with sleeping and fear of re-arrest is not severe distress); *Lundy*, 209 Ill. App. 3d 790, 567 N.E.2d 1101 (embarrassment or distress suffered by plaintiff police officers when they were stripped of badges and guns and relieved of duty until they could undergo a psychological reevaluation did not support claim for intentional infliction of emotional distress). Here, when questioned concerning his reaction to his arrest and incarceration, the plaintiff stated that he was afraid; that he was fearful about his career and what his colleagues, friends and loved ones would think and hear about his being charged with a criminal act that he did not commit; and that he cried when his mother arrived at the police station to post bail. There was no evidence to show the severity of the distress he suffered, *i.e.*, that he was hospitalized, sought and received psychiatric treatment, or even was prescribed medication. See *Knysak v. Shelter Life Insurance Co.*, 273 Ill. App. 3d 360, 652 N.E.2d 832 (1995) (depression and distress suffered as a result of insurer's failure to pay insured spouse's medical bills was not severe or extreme emotional distress). See generally Restatement (Second) of Torts § 46, Comment *h*, at 78 (1965) (while bodily harm is not required, it affords evidence that distress was genuine and severe). Absent proof that the emotional distress suffered by the plaintiff was so severe as to exceed all bounds of human decency, the stringent test established for this tort has not been satisfied. See, *e.g., Public Finance Corp.*, 66 Ill. 2d 85, 360 N.E.2d 765; *Knysak*, 273 Ill. App. 3d 360, 652 N.E.2d 832; *Khan*, 266 Ill. App. 3d 726, 639 N.E.2d 210.

In addition to the failure to prove severe and emotional distress, the plaintiff failed to prove extreme and outrageous conduct. The plaintiff argues that Dziagwa and Hertz engaged in extreme and outrageous conduct when they caused his arrest on a criminal charge that he did not commit and refused to dismiss the charge against him thereby requiring him to attend a court hearing. We disagree.

The evidence, viewed in its aspect most favorable to the plaintiff, does not support an intentional infliction of emotional distress claim. The nature of the conduct alleged against Dziagwa does not rise to the level of extreme outrageousness so as to go beyond all possible

bounds of decency. Initially, we note that Dziagwa was not the cause of defendant's arrest by Officer Lucas. Lucas' uncontroverted testimony showed that the plaintiff was placed under arrest after a name and vehicle check showed the existence of traffic warrants based upon outstanding traffic violations. The evidence showed that after the plaintiff was taken into custody and brought to the police station, Lucas telephoned Hertz and spoke to Dziagwa. After Dziagwa was unable to reach Kendall, the IBM employee who had leased the vehicle, Dziagwa told Lucas to charge the plaintiff with criminal trespass to a vehicle. At that time Dziagwa was unaware that the plaintiff was an IBM employee[2] and knew only that the vehicle should have been returned to Hertz more than a month earlier. Dziagwa's decision to authorize the complaint made under these circumstances cannot be said to be outrageous conduct. See *Khan*, 266 Ill. App. 3d 726, 639 N.E.2d 210 (conduct of airline employees in allegedly entrapping plaintiff and having him arrested did not go beyond all possible bounds of decency); *Anderson v. Village of Forest Park*, 238 Ill. App. 3d 83, 606 N.E.2d 205 (1992) (police officers' removal of plaintiff from her residence and subjecting her to involuntary mental examination did not support a claim for intentional infliction of emotional distress). Even if later that evening Dziagwa may have become aware of the fact that the plaintiff was an IBM employee and that he was authorized to use the rental vehicle, Dziagwa's failure to withdraw the criminal complaint still would not have risen to the level of extreme outrageousness. As will be more fully discussed below with respect to plaintiff's malicious prosecution claim, after that complaint was signed, the furtherance and prosecution of the criminal action was in the control of the State's Attorney, and neither Dziagwa nor Hertz could have withdrawn the complaint. See 55 ILCS 5/3—9005(a)(1) (West 1994) (it is the duty of the State's Attorney to prosecute criminal proceedings); *People v. Eisele*, 77 Ill. App. 3d 766, 396 N.E.2d 662 (1979) (State's Attorney can file motion to nol-pros where defendant charged by complaint and witness could not identify defendant at trial). Moreover, aside from the fact that a private complainant lacks the power to preempt the discretion of the prosecutor to proceed on the complaint, any omission in failing to inform the prosecutor of newly discovered information relevant to the criminal action set in motion would arguably, at best, constitute passive conduct that by its very nature could not rise to the level of outrageous conduct.

---

[2]Although the plaintiff testified that he told Officer Lucas, at the time of his arrest, that he was an IBM employee, neither Lucas nor Dziagwa testified that Lucas relayed that information to Dziagwa.

## II. Malicious Prosecution

■ With respect to the underlying claim for malicious prosecution, the plaintiff was required to prove: (1) the commencement or continuation of an original or criminal judicial proceeding by the defendant; (2) the termination of the prosecution in favor of the plaintiff in a manner indicative of the innocence of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *E.g., Swick v. Liautaud*, 169 Ill. 2d 504, 662 N.E.2d 1238 (1996); *Joiner v. Benton Community Bank*, 82 Ill. 2d 40, 411 N.E.2d 229 (1980); *Vincent v. Williams*, 279 Ill. App. 3d 1, 664 N.E.2d 650 (1996); *Khan*, 266 Ill. App. 3d 726, 639 N.E.2d 210. The burden is on the plaintiff to prove each of these elements, and the absence of any one of them bars a plaintiff from recovery. See *Swick*, 169 Ill. 2d 504, 662 N.E.2d 1238.

At trial and during this appeal, the defendants argue that they were entitled to judgment notwithstanding the verdict on plaintiff's claim for malicious prosecution because the plaintiff did not establish termination of the prosecution in a manner indicative of the innocence of the plaintiff and because the plaintiff did not establish absence of probable cause. While we do not agree with their first contention, we do find merit with respect to the second contention.

■ The evidence at trial regarding the favorable termination element showed that Dziagwa did not appear in court to testify against the plaintiff and that the State's Attorney dismissed the charges. In *Swick v. Liautaud*, 169 Ill. 2d 504, 662 N.E.2d 1238 (1996), a case of first impression, the court dealt with the issue of whether a *nolle prosequi* by the State's Attorney constitutes a favorable termination in malicious prosecution actions. In that regard the court stated:

> "In a criminal context, a *nolle prosequi* 'is not a final disposition of a case but *** is a procedure which reverts the matter to the same condition which existed before the commencement of the prosecution.' (*People v. Woolsey* (1990), 139 Ill. 2d 157, 163[, 564 N.E.2d 764].) In the civil malicious prosecution context, the majority rule is that a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused. [Citations.] The abandonment of the proceedings is not indicative of the innocence of the accused when the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bring-

ing the accused to trial. (Restatement (Second) of Torts §§ 660, 661 (1977).) We find that the majority rule best reflects the need to balance an individual's right to be free from unreasonable criminal prosecutions with the public policy which favors the exposure of crime. (See *Joiner*, 82 Ill. 2d at 44 ('[p]ersons acting in good faith who have probable cause to believe crimes have been committed should not be deterred from reporting them by the fear of unfounded suits by those accused').)" 169 Ill. 2d at 512-13, 662 N.E.2d at 1242-43.

In *Swick*, the plaintiff alleged that the *nolle prosequi* was entered because of a lack of evidence showing his guilt. The *nolle prosequi* order did not reflect the reason for its entry. No evidence was produced at trial to prove that the *nolle prosequi* order was entered in a manner indicative of the plaintiff's innocence. However, recognizing that the issue was one of first impression, the court remanded the case to give the plaintiff the opportunity to prove his assertion.

■ In the instant case, the defendants argue that the plaintiff here, as in *Swick*, did not establish the specific nature of the dismissal, that is, whether the charges were dismissed by a *nolle prosequi* order or whether the case was stricken from the docket with leave to reinstate (see *Vincent*, 279 Ill. App. 3d 1, 664 N.E.2d 650 (striking case from docket with leave to reinstate is not a legal termination in favor of the accused)). We disagree. Dziagwa testified that he did not and would not testify against the plaintiff in the criminal action because he had been ordered by his superiors not to do so. This testimony clearly established the reason for the dismissal of the criminal action, the State's inability to prove its case against the accused. A dismissal on that basis is a termination in favor of the accused indicative of the accused's innocence. See *Reell v. Petritz*, 224 Ill. App. 65 (1922) (dismissal of larceny charge by prosecutor was termination of the proceeding in favor of the plaintiff); *Farris v. Messimore*, 219 Ill. App. 582 (1920) (dismissal of charge by justice of peace for failure of complaining witness to appear was a termination of the proceeding in favor of the plaintiff). See also *Rich v. Baldwin*, 133 Ill. App. 3d 712, 717, 479 N.E.2d 361 (1985), citing *Loeb v. Teitelbaum*, 77 A.D.2d 92, 432 N.Y.S.2d 487 (1980) (dismissal of criminal charges based upon plaintiff's speedy trial motion constituted termination of the proceedings in favor of the plaintiff since prosecutor's failure to proceed on the merits implies lack of reasonable grounds for the prosecution).

We find merit, however, with defendants' second malicious prosecution contention, that the plaintiff did not establish an absence of probable cause by Dziagwa to commence or continue the criminal

proceedings. As stated in *Mack v. First Security Bank*, 158 Ill. App. 3d 497, 502, 511 N.E.2d 714, 717 (1987), probable cause is "a state of facts *** that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." The existence of probable cause is a mixed question of law and fact. *Mack*, 158 Ill. App. 3d 497, 511 N.E.2d 714. " 'Whether the circumstances proved to show probable cause are true is a question of fact, but, if true, whether they amount to probable cause is a question of law to be decided by the court.' " *Ely v. National Super Markets, Inc.*, 149 Ill. App. 3d 752, 758, 500 N.E.2d 120, 124 (1986), quoting 25 Ill. L. & Prac. *Malicious Prosecution* § 42 (1956). A person has probable cause to believe that the misdemeanor offense of criminal trespass to vehicles has been committed when the accused "knowingly and without authority enters any vehicle *** of another without his consent." Ill. Rev. Stat. 1977, ch. 38, par. 21—2 (now 720 ILCS 5/21—2 (West 1996)).

Viewing the facts in the light most favorable to the plaintiff, it is clear that the plaintiff failed to prove that Dziagwa lacked probable cause at the time he authorized Lucas to sign the criminal complaint on behalf of Hertz. The uncontroverted facts establish probable cause as a matter of law. See *Ely*, 149 Ill. App. 3d 752, 500 N.E.2d 120 (applying *Pedrick* standard and reversing malicious prosecution verdict). As noted above, it was undisputed that, at the time Dziagwa authorized Lucas to charge the plaintiff with criminal trespass to vehicles, Dziagwa had been advised by Lucas that the plaintiff had been stopped driving a vehicle with expired license plates; that the plaintiff had been arrested due to an outstanding warrant; that the plaintiff stated that the car was leased and belonged to a friend; and that there was no rental agreement in the car. Upon further investigation, Dziagwa discovered that the vehicle had been leased to IBM by Sharon Kendall, an IBM employee, and that the vehicle should have been returned to Hertz more than a month earlier. Conflicting evidence existed with respect to whether Dziagwa had been informed by Lucas that the plaintiff's driver's license was invalid. While Dziagwa testified that he thought he had been told that fact, Lucas only testified that the plaintiff was cited for violating one of the restrictions on his driver's license. However, even if Dziagwa's consideration of that fact was improper, the other information known by Dziagwa and discussed above was sufficient to establish probable cause for the charge of criminal trespass to vehicles at the time that charge was made.

The plaintiff argues that Dziagwa did not have probable cause because he knew that the Hertz vehicle had not been reported stolen

and that the vehicle had been leased to IBM by one of its employees, the defendant's friend, and that the defendant was authorized to use the vehicle. We disagree. Plaintiff's authority to drive the Hertz vehicle was not derived from plaintiff's friendship with Kendall but from his employment status with IBM. In that regard there was no evidence showing that at the time Dziagwa authorized the charge against the plaintiff that Dziagwa knew that the plaintiff was an IBM employee and that he was authorized to drive the vehicle leased by IBM. Even if the plaintiff's testimony that he gave Lucas his IBM identification card is to be believed, that testimony would at best establish Lucas's knowledge, not Dziagwa's knowledge, of plaintiff's status as an IBM employee. The plaintiff presented no evidence to establish that Lucas disclosed that information to Dziagwa so as to contradict Dziagwa's testimony denying any knowledge of that fact. Thus, since the only evidence at trial showed that Dziagwa did not know of the plaintiff's employment with IBM and his authority to drive a vehicle leased by that entity, and given the other facts known by Dziagwa at the time he authorized the charge, one can only conclude that Dziagwa had probable cause to believe that the plaintiff's use of the vehicle was unauthorized.

The plaintiff also argues that even if Dziagwa had probable cause to authorize the initial charging of the plaintiff, he did not have probable cause to continue the criminal proceedings and thus he and Hertz were liable for malicious prosecution on that basis as well. Liability for malicious prosecution can be imposed when an active part is taken in continuing or procuring the continuation of criminal proceedings. Restatement (Second) of Torts § 655, at 413 (1977). With respect to the type of participation that is required, the Restatement (Second) of Torts states in pertinent part as follows:

"[T]he defendant must take an active part in their prosecution after learning that there is no probable cause for believing the accused guilty. It is not enough that he appears as a witness *** and thereby aids in the prosecution of the charges which he knows to be groundless. His share in continuing the prosecution must be active, as by insisting upon or urging further prosection. The fact that he initiated the proceedings does not make him liable *** merely because he intentionally refrains from informing a public prosecutor, into whose control the prosecution has passed, of subsequently discovered facts that clearly indicate the innocence of the accused." Restatement (Second) of Torts § 655, Comment c, at 414 (1977).

See *Denton v. Allstate Insurance Co.*, 152 Ill. App. 3d 578, 584, 504 N.E.2d 756 (1986) (citing Restatement (Second) of Torts § 655 (1977)

and stating that defendant's delay in reporting to police its settlement of plaintiff's insurance claim for theft of his automobile did not constitute active encouragement or participation in criminal proceedings for attempted theft instituted by police officer).

Here, while the plaintiff may well be correct in his contention that Dziagwa did not have probable cause to continue the criminal proceedings if Kendall informed him that the plaintiff was an IBM employee and had authority to use the vehicle, the evidence at trial showed that neither Dziagwa nor Hertz acted affirmatively to continue the criminal proceedings after that knowledge was acquired. As discussed above, Dziagwa did not attend the criminal hearing. There was no evidence established that he or anyone else at Hertz took any action to pursue the criminal action against the plaintiff. Moreover, once the complaint was initiated by Hertz, the prosecution of the action became the duty of the State's Attorney (see Ill. Rev. Stat. 1979, ch. 14, par. 5(1) (now 55 ILCS 5/3—9005(a)(1) (West 1994)) (it is the duty of the State's Attorney to initiate and prosecute criminal proceedings); see *People v. Pankey*, 94 Ill. 2d 12, 445 N.E.2d 284 (1983) (the State's Attorney prosecutes all actions by and for the People of the State of Illinois)); and the dismissal of that action must be pursuant to court order (see Ill. Rev. Stat. 1979, ch. 38, par. 114—1 (now 725 ILCS 5/114—1 (West 1994)); see also 725 ILCS Ann. 5/111—1, Committee Comments—1963, at 111 (Smith-Hurd 1992) ("[t]he distinction of the complaint rests in the fact that neither the grand jury nor the [S]tate's [A]ttorney sign the written statement charging the crime")). While Hertz could have notified the State's Attorney that it would not testify against the plaintiff in the criminal action, the ultimate decision on whether to continue to prosecute the plaintiff would have been with the State's Attorney. See *People v. Eisele*, 77 Ill. App. 3d 766, 396 N.E.2d 662 (1979) (where defendant charged by complaint and witness could not identify him at trial, proper action by State's Attorney is to file a motion to nol-pros). Thus, since the evidence at trial showed that Dziagwa and Hertz did not actively participate in the criminal prosecution after initiating that action, the plaintiff did not establish his malicious prosecution action against them and the attorney malpractice defendants were entitled to judgment notwithstanding the verdict on that claim.

### III. Defamation

Plaintiff's defamation claim against Dziagwa and Hertz asserted defamation *per se* based upon a statement made by Dziagwa to Kendall in which Dziagwa allegedly imputed that the plaintiff had committed a crime. The alleged defamatory statement was explained by Kendall as follows:

"He [Dziagwa] said I am not letting this guy go and proceeded to give his reasons for not letting this guy go, his license plates, the warrant out for his arrest and past offenses in other places along with cars, something to do with car theft."

■ A statement is considered to be defamatory if it tends to cause harm to the reputation of another by lowering that person in the eyes of the community or deterring third persons from associating with the person. Restatement (Second) of Torts § 559 (1977). In *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10, 607 N.E.2d 201, 206 (1992), our supreme court defined defamation *per se* as a "statement [that] is apparent on its face—that is, when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed." There are four common law categories of statements that are considered to be defamatory *per se*: (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; and (4) words that prejudice a party, or impute lack of ability, in his or her trade, profession or business. *E.g., Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402, 532 N.E.2d 790 (1988). In order to constitute slander *per se* for imputing the commission of a crime, the crime must be an indictable one, involving moral turpitude and punishable by death or by imprisonment in lieu of a fine. *Ely v. National Super Markets, Inc.*, 149 Ill. App. 3d 752, 500 N.E.2d 120 (1986). A statement is not defamatory if the words and implications, given their natural and obvious meaning, may reasonably be innocently interpreted. *Mittelman v. Witous*, 135 Ill. 2d 220, 552 N.E.2d 973 (1989); *Chapski v. Copley Press*, 92 Ill. 2d 344, 442 N.E.2d 195 (1982). This determination is a question of law. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 672 N.E.2d 1207 (1996).

■ Here, the plaintiff argues that Dziagwa's words were defamatory *per se* because they imputed the commission of a criminal offense.[3] The defendants argue that the alleged statement by Dziagwa did not reasonably impute the commission of a criminal offense. On

---

[3]The plaintiff does not argue defamation *per quod* apparently because he could not prove special damages. While damages are presumed when the statement is defamatory *per se* (*Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 607 N.E.2d 201 (1992)), they must be alleged and proved when the statement is defamatory *per quod* (see *Schaffer v. Zekman*, 196 Ill. App. 3d 727, 554 N.E.2d 988 (1990)). *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 672 N.E.2d 1207 (1996). Here the plaintiff did not prove that he was damaged by Dziagwa's alleged statement to Kendall. Kendall testified that after

appeal, they also argue that the common interest privilege existed. This latter argument is waived because it was not raised in the trial court. See *Mittelman*, 135 Ill. 2d 220, 552 N.E.2d 973; *Downes Swimming Pool, Inc. v. North Shore National Bank*, 124 Ill. App. 3d 457, 464 N.E.2d 761 (1984).

In support of their first contention the defendants rely on *Trembois v. Standard Ry. Equipment Manufacturing Co.*, 337 Ill. App. 35, 84 N.E.2d 862 (1949). In that case, the alleged defamatory statements were that the plaintiff was "mixed in a rape charge"; that "the police arrested him for jumping bond on the rape charge"; that the plaintiff "was arrested for supposedly jumping bond in connection with rape"; that the plaintiff "was arrested for rape"; and that the plaintiff "was picked up by the police." The *Trembois* court found that these words did not impute the commission of the crime of rape or state that the plaintiff was a rapist. The court noted that being arrested for an offense and being charged with an offense are not evidence of guilt of that offense.

Here, as in *Trembois*, the statements attributed to Dziagwa did not definitively impute the commission of a crime. The first part of Dziagwa's statement disclosed that the plaintiff was being held by the police because a warrant had been issued for the plaintiff's arrest. That statement did not impute the commission of a crime but, rather, that the defendant had been arrested. See *Trembois*, 337 Ill. App. 35, 84 N.E.2d 862. Dziagwa's reference to "past offenses in other places along with cars, something to do with car theft," also does not impute the commission of a crime. That statement, like the statement in *Trembois* that the plaintiff therein was "mixed in a rape charge," is vague. It also does not clearly and definitively refer to a specific offense that is indictable and punishable by death or imprisonment. It does not state that plaintiff had committed a car theft but, rather, that he had committed past unspecified offenses that had something to do with car theft. While the words charging the commission of a crime need not meet the technical requirements that are necessary for an indictment, the words must fairly impute the commission of a crime. *Crinkley v. Dow Jones & Co.*, 119 Ill. App. 3d 147, 456 N.E.2d 138 (1983). See *Owen v. Carr*, 134 Ill. App. 3d 855, 859, 478 N.E.2d 658 (1985), *aff'd*, 113 Ill. 2d 273, 497 N.E.2d 1145 (1986) (statement that plaintiff was "trying to 'intimidate' " a judge did not impute commission of criminal offense of intimidation because

---

the March 10, 1979, incident she did not feel differently about the plaintiff and her respect for the plaintiff never changed.

term "intimidation" has a broader, noncriminal meaning). Here, Dziagwa's alleged statement did not fairly impute that the plaintiff had committed a car theft or any other indictable criminal offense. Thus, viewing the evidence in a light most favorable to the plaintiff, we must conclude that the plaintiff did not establish his underlying claim of defamation *per se* and the defendants were entitled to judgment notwithstanding the verdict on that claim as well.

## IV. Disposition

For the reasons discussed above, we affirm the trial court's grant of judgment notwithstanding the verdict to the defendants on plaintiff's underlying intentional infliction of emotional distress claim. We reverse the trial court's denial of defendants' motion for judgment notwithstanding the verdict on plaintiff's underlying malicious prosecution and defamation claims. As a result, the issues raised in plaintiff's appeal regarding his right to recover punitive damages in this attorney malpractice action and regarding the propriety of the trial court's order directing a new trial on the malicious prosecution and defamation counts have been rendered moot.

For the foregoing reasons, the judgment of circuit court of Cook County is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

CAHILL AND LEAVITT, JJ., concur.