**Robert P. BEATTY, Plaintiff–Appellant,**

v.

**Phillip S. WOOD and Wood & Johnson, P.C., Defendants–Appellees.**

No. 98–4226.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1999

Decided Feb. 17, 2000

Norman Rifkind (argued), Lasky & Rifkind, Chicago, IL, for Plaintiff-Appellant.

P. Shawn Wood (argued), D'Ancona & Pflaum, Chicago, IL, for Defendants-Appellees.

Before POSNER, Chief Judge, EASTERBROOK and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Robert P. Beatty filed this legal malpractice case against Phillip S. Wood and Wood & Johnson, P.C. (hereinafter jointly referred to as "Wood") alleging that attorney negligence by Wood precluded his age discrimination case against the FAA. Beatty was employed with the FAA, Department of Transportation from 1962 until his retirement in September 1996. He

was an Air Traffic Manager of Willow Run Tower at Detroit Metro from 1987 to 1995, and in 1992 Dennis Ragle became his supervisor. In 1995, Ragle issued Beatty a performance rating of "unacceptable" for the period from August 1993 to March 1995, and on April 10, 1995, Ragle reassigned him to the position of Program Specialist at Detroit Metro. That position was the same pay and grade as Air Traffic Manager, but Beatty contends that in contrast to the Air Traffic Manager position, it was a much lower profile position with no management responsibilities and no possibility for promotion. Beatty refused to report to the reassigned position when it commenced in June 1995, and claimed medical leave for a year. When the FAA sought further proof of eligibility for medical leave after the year, he chose instead to voluntarily retire. During that same time period, Beatty also challenged the reassignment in two forums. He filed an administrative grievance challenging the reassignment and the performance evaluation, and in August 1995 he filed an EEOC complaint. In both he alleged age discrimination. The FAA ultimately agreed to change the performance evaluation from "unsuccessful" to "fully successful," but refused to alter the reassignment, declaring that it was based on his conduct not his performance.

Wood represented Beatty in an appeal of his administrative grievance to the United States Merit Systems Protection Board ("Merit Board"). That appeal was unsuccessful because the Merit Board ruled that a reassignment to a position of the same grade and pay was not an adverse employment action redressable by the Board. The EEOC complaint was dismissed in November 1995, on the grounds that Beatty's filing of a negotiated grievance required dismissal. All parties agree that the EEOC dismissal was erroneous, and could have been reversed if a timely appeal

was taken. Unfortunately, that did not happen. Wood received a copy of the dismissal, but never informed Beatty. Wood maintains that it was not representing Beatty before the EEOC, but conceded representation for the purposes of the summary judgment motion below, and thus we assume it on appeal as well. Beatty became aware of the dismissal only after he contacted first Wood and then the EEOC. Although Wood filed an appeal on Beatty's behalf in April 1996, that appeal was dismissed as untimely. Beatty subsequently brought this action alleging professional negligence in the failure of Wood to timely appeal the dismissal of the 1995 EEOC complaint.[1]

## I.

Illinois law controls the professional negligence claim, and provides for recovery where a plaintiff can prove the existence of an attorney-client relationship, a duty arising from that relationship, actual damages, and proximate cause such that "but for" the attorney's negligence, the plaintiff would have prevailed in the underlying action. *Lucey v. Law Offices of Pretzel & Stouffer, Chtd.*, 301 Ill.App.3d 349, 234 Ill.Dec. 612, 703 N.E.2d 473, 476 (Ill. App. 1 Dist.1998); *Adams v. Sussman & Hertzberg*, 292 Ill.App.3d 30, 225 Ill.Dec. 944, 684 N.E.2d 935, 938 (Ill.App. 1 Dist. 1997). Thus, in order to succeed on such a claim, the plaintiff must show that his underlying case, in this case the age discrimination claim, was meritorious. *Nika v. Danz*, 199 Ill.App.3d 296, 145 Ill.Dec. 255, 556 N.E.2d 873, 882 (Ill.App. 4 Dist.1990).

All parties agree that the EEOC dismissal of the claim based on the pendency of the grievance was erroneous. Wood's expert conceded that the EEOC erroneously dismissed the complaint because it believed Beatty had filed a grievance under a negotiated labor agreement, when in

---

1. Beatty filed another EEOC complaint in 1996 after he retired, alleging constructive discharge. That case was settled. Wood argues that the 1996 claim encompassed the reassignment issue, and that the settlement rendered his claim for damages meritless. Because of our disposition of this appeal, we need not address this claim.

fact his grievance was filed under an agency administrative grievance system which did not in itself prevent an employee from filing a concurrent EEOC complaint. Therefore, the question is whether the claim of discrimination could have succeeded under the Age Discrimination in Employment Act (ADEA). Because Beatty has produced insufficient evidence to demonstrate a viable ADEA case, he has failed to establish a claim of professional negligence and the district court properly granted summary judgment.

## II.

■ A plaintiff can establish age discrimination through direct evidence, or more commonly through the burden-shifting method of *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Kaniff v. Allstate Ins. Co.,* 121 F.3d 258, 263 (7th Cir.1997). Beatty argues under both standards.

■ As direct evidence of age discrimination, he identifies comments allegedly made by Ragle. First, Beatty argues that the grievance examiner's summary of statements contains a comment by Ragle that Beatty "was close to retirement age and they were not going to fire him. [H]e's been around a long time." Moreover, Ragle admitted that he may have stated that they needed "new blood." Neither of these comments provides direct evidence of age discrimination. The first comment was made by Ragle to the grievance examiner in discussing why Beatty was not placed on a performance improvement period ("PIP"):

> He [Ragle] said that you put a person on a PIP when you are going to take adverse action. A PIP is something that is done for someone who doesn't know his job, and Bob was an experienced individual. He said that Bob was close to retirement age, and they were not going to fire him. "He's been around a long time—it was more of a conduct issue than a performance issue."

Those interview notes do not provide evidence of age discrimination. If anything, it appears that they were *disinclined* to fire Beatty because of his years of experience with the company and because he was nearing retirement. Beatty can hardly claim that they discriminated against him by taking less drastic action against him because of his age and experience. The context is further clarified by a subsequent quote in the grievance examiner's notes in which Ragle said management "wasn't going to fire someone in the latter part of his career; there was a lot of worth still in him." Those comments merely indicate that age was a factor in the decision not to fire him. It says nothing about whether age played a role in the decision to reassign him, as opposed to leaving him in his same position. For that determination, Beatty still must show that the identified reasons for the reassignment were pretextual. *See e.g. Kaniff,* 121 F.3d at 263; *Pitasi v. Gartner Group, Inc.,* 184 F.3d 709, 715 (7th Cir.1999) (holding that an employer's suggestion of retirement did not give rise to an inference of discrimination when presented as a more palatable option to dismissal or layoff; plaintiff required to demonstrate that employer's reasons for the dismissal or layoff were pretextual).

■ The second statement identified by Beatty, that Ragle said they needed "new blood," fares no better. That statement does not, in isolation, evidence age-based discriminatory animus. *See e.g. Fortier v. Ameritech Mobile Communications, Inc.,* 161 F.3d 1106, 1113 (7th Cir.1998) (indicating that the term "new blood" in the abstract means a change and is not direct evidence of age discrimination). Of course, in some contexts, it might well be indicative of age discrimination, but there was absolutely no evidence produced in this case to provide such a context. *See e.g. Fortier,* 161 F.3d at 1113 (examining context in which remarks were made) and *Buckley v. Hospital Corp. of America,* 758 F.2d 1525, 1530 (11th Cir.1985) ("new blood" evidence of age discrimination in

context) cited in *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1165 n. 3 (7th Cir.1994). Therefore, Beatty has failed to produce direct evidence of age discrimination.

■ Absent direct evidence, age discrimination may be demonstrated indirectly through the *McDonnell–Douglas* framework. Under that approach, Beatty must first demonstrate a *prima facie* case of discrimination by a preponderance of the evidence. The burden then shifts to the FAA to come forward with evidence of a legitimate nondiscriminatory reason for discharging Beatty. If the FAA does so, then Beatty must demonstrate that the FAA's proffered reason is pretextual. *Pitasi*, 184 F.3d at 716. It is this third prong that the district court and the parties in this case dispute. All appear to assume that the first two prongs would be met, but contest whether Beatty could meet his burden of proving that the asserted reasons were pretextual. To meet that burden, Beatty must be able to demonstrate that the proffered reasons for the reassignment had no basis in fact, that they did not actually motivate the reassignment, or that they were insufficient to motivate the reassignment. *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995).

■ We turn, then, to the reasons given by the FAA for the reassignment from Air Traffic Manager to Program Specialist, and to Beatty's arguments that they were pretextual. Most of those justifications for the reassignment boil down to the perception that Beatty exhibited an authoritarian style of supervision that was ill-suited to the changing nature of the workforce and the cooperative management methods being implemented at the FAA. The specific "conduct problems" which sparked the reassignment included: Beatty's opposition to the "Hub" system implemented by the FAA; the hostile climate towards women and minorities under Beatty's supervision; poor management decisions and use of resources; and Beatty's disregard of FAA directives and falsification of time records.

The FAA had instituted an intermediate level of management between the air traffic facilities and the regional offices called the "Hub," through which the facilities were supposed to communicate. Ragle reported that Beatty disliked the Hub concept and attempted to undermine it, including ordering his subordinates to conceal information from the Hub and rebuking a subordinate for contacting the Hub regarding an issue. FAA employees Sharon Bishop and Babbette Hodges confirmed that problem.

Ragle also decried the climate of the facility under Beatty's supervision, which he characterized as hostile to women and minorities. A number of formal and informal complaints had been filed against Beatty in the years preceding the reassignment regarding that workplace atmosphere, including several EEOC complaints. In August 1994, Ragle personally investigated a complaint by one employee and found Beatty to be at fault. The FAA then sent an organizational development team to Willow Run, and the report from the team indicated a hostile environment at the facility toward women and people of color. Beatty was subsequently sent to diversity training, but Ragle did not believe that the situation had improved.

In addition, Ragle identified a number of poor management practices by Beatty which caused him concern. The FAA documented an occurrence in which Beatty failed to report an aircraft accident in a timely manner, instead waiting four days to do so. Beatty also disobeyed FAA directives regarding vehicle crossing of runways and procedures for "taxi into position and hold." Moreover, Beatty allowed improper time-keeping practices, allowing controllers to regularly leave early without documenting that in the time records. He also had problems in limiting the use of overtime, and in efficiently running the facility in a time of dwindling resources. Finally, Ragle believed that Beatty showed

poor judgment in allowing a party at the base of the Willow Run tower in view of the public, in which air traffic controllers were drinking beer. Ragle ordered him not to allow any further parties of that nature. This occurred a few years before the reassignment, but Ragle had learned that Beatty continued to refer to the incident, telling his subordinates "that's what happens when the Hub finds out what we are doing."

In response to the FAA's litany of problems culminating in the reassignment, Beatty provides virtually no evidence of pretext. He argued that the organizational specialists did not report significant problems with the facility, and that Ragle's notes of the meeting with them did not reflect that Beatty had been unable to manage the facility. Beatty also pointed to some positive comments about his performance, including that he had a positive relationship with the union, and that the perception of a hostile environment was limited to two women. Beatty suggested that the problem was with the complaining women, not his management of the facility. Similarly, he acknowledges that he did not follow the FAA directives, but claims his method was superior and was ultimately the procedure adopted by the FAA. Finally, he asserted that the beer party incident occurred during the prior rating period, and he was given a meritorious rating for that time period.

■ Beatty's response does not demonstrate that the FAA's reasons were pretextual. In fact, his response in large part does not even directly address the reasons given by the FAA, but rather points to other instances of positive feedback as evidence that he was doing a good job. That falls far short of establishing pretext. "For purposes of the ADEA, we may not be concerned with whether the decision was right or wrong, fair or unfair, well-considered or precipitous. We must look only at whether the decision was discriminatory or, in the pretext analysis, whether it actually did underlie the plaintiff's termination." *O'Connor v. DePaul Univ.*, 123 F.3d 665, 670 (7th Cir.1997). Beatty has produced nothing to demonstrate that the asserted reasons were not the true basis for the reassignment. He questions the wisdom of the decision, pointing to positive attributes of his performance, but that is irrelevant to the pretext analysis. For the most part, however, he does not challenge the facts relied on by Ragle in his decision, but disputes Ragle's assessment of those facts. For instance, he does not refute the incidents regarding the Hub, or the disregard of the FAA directives, but instead attempts to explain his actions. As long as Ragle actually relied on those incidents to make his decision to reassign Beatty, the reasons are not pretextual. As we stated in *O'Connor*, "on the issue of pretext our only concern is the honesty of the employer's explanation," and there is no evidence calling that into question here. *Id.* at 671. Therefore, Beatty could not withstand summary judgment on the ADEA claim because he has no evidence of pretext.[2] Without a meritorious ADEA claim, Beatty cannot establish damages from the alleged legal malpractice, and his claim must fail.

■ Beatty makes one last effort, however, to salvage his professional negligence claim, arguing that his ADEA claim would have netted him money in a settlement even if he could not have ultimately succeeded on the merits. In other words, Beatty attempts to show damages not by demonstrating that his case was meritorious, but by showing that he could have

---

**2.** Beatty presented an alternative argument for finding age discrimination, arguing that similar reassignments occurred twice in the past, and in both cases it was a successful effort to force the employee into retirement. That allegation, if supported, could raise an inference of discrimination, but Beatty presents no facts to support the bald allegation. He fails to even identify the two individuals involved, much less present evidence that they were forced into retirement or that the reassignment was done for that purpose. Therefore, this allegation is too conclusory to support his argument.

obtained settlement for the nuisance-value of the suit if he had been able to bring the ADEA claim. A legal malpractice cause of action is meant to provide a litigant with damages that he would have been entitled to under law had the case been properly handled. It is not a vehicle for compensating a litigant for the damages that could have been extracted by pursuit of a meritless case. For that reason, under Illinois law an element of a legal malpractice claim is the requirement that plaintiff demonstrate that "but for" the attorney's negligence, he would have prevailed in the underlying action. *Lucey*, 234 Ill.Dec. 612, 703 N.E.2d at 476. We have already held that the thrust of that requirement is that "a malpractice plaintiff cannot prevail merely by showing that his claim which his lawyer booted, though baseless, had some nuisance value." *Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1193 (7th Cir.1999).

For the above reasons, the decision of the district court is AFFIRMED.