# Illinois Official Reports

## Appellate Court

*Kapotas v. Better Government Ass'n*, 2015 IL App (1st) 140534

| | |
|---|---|
| Appellate Court Caption | JAMES KAPOTAS, Plaintiff-Appellant, v. BETTER GOVERN-MENT ASSOCIATION, SUN-TIMES MEDIA, NBC SUBSIDIARY (WMAQ-TV), LLC, DICK JOHNSON, individually, and PATRICK REHKAMP, individually, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-0534 |
| Filed | March 31, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-9864; the Hon. Daniel T. Gillespie, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Scott J. Larsen and Michael C. Keefe, both of Larsen Law Firm, P.C., of Chicago, for appellant.<br><br>Damon E. Dunn and Seth A. Stern, both of Funkhouser Vegosen Liebman & Dunn Ltd., of Chicago, for appellee Sun-Times Media.<br><br>Samuel Fifer, Natalie J. Spears, and Kristen C. Rodriguez, all of Dentons US LLP, of Chicago, for other appellees. |

JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Palmer and Justice Gordon concurred in the judgment and opinion.


## OPINION

¶ 1    Plaintiff, James Kapotas, M.D., appeals an order of the circuit court of Cook County dismissing his verified second amended complaint against defendants Better Government Association (BGA), Sun-Times Media (the Sun-Times), NBC Subsidiary (WMAQ-TV), LLC (WMAQ), Dick Johnson (Johnson), and Patrick Rehkamp (Rehkamp), which alleged defamation, false-light invasion of privacy, tortious interference with business expectancy, and public disclosure of private facts. For the following reasons, we affirm the judgment of the circuit court.

¶ 2                                   BACKGROUND

¶ 3    Plaintiff initially filed a verified complaint against defendants on August 30, 2012, in the circuit court of Cook County.[1] The operative pleading in this appeal is the verified second amended complaint, filed on May 7, 2013.[2]

¶ 4    The verified second amended complaint alleged that plaintiff was employed as an orthopedic surgeon at John H. Stroger, Cook County Hospital (Stroger Hospital) from October 1999, through November 5, 2011, when he resigned as chief of orthopedic surgery. Prior to his resignation, plaintiff, in April 2011, requested and was granted a leave of absence from Stroger Hospital.

¶ 5    During the leave of absence, Stroger Hospital issued checks to plaintiff by direct deposit for untaken sick leave and vacation time "in an amount totaling $135,000." After payroll deductions, plaintiff received net payments of $76,776.14. Stroger Hospital does not allow physicians to use sick time for nonmedical leaves of absence.[3] Unused sick time, however, has value insofar as it can be added to a pension. The payments issued during the leave of absence were allegedly due to a clerical error. Plaintiff alleged that when he learned he had received county funds due to a clerical error, he immediately assisted in correcting the problem by paying the county back.

¶ 6    On November 4, 2011, Cathy Bodnar (Bodnar), the chief compliance and privacy officer of the Cook County Health & Hospitals System, sent an email to Dr. Richard Keen (Keen), identified in the complaint only as "another surgeon at Stroger Hospital." Bodnar directed Keen to request that plaintiff submit a letter of resignation and a check for $76,776.14 payable to the Cook County treasurer.

---

[1]The verified complaint also named NBC Universal Media, LLC, a co-owner of WMAQ, as a defendant.

[2]The circuit court granted the motion by plaintiff for leave to file the verified second amended complaint on that date. The first amended complaint is not included in the record on appeal.

[3]The complaint does not state whether this prohibition was a written policy.

¶ 7    On November 5, 2011, upon receiving an email from Keen, plaintiff resigned from Stroger Hospital. The email stated in part that plaintiff: (1) had taken an unpaid leave of absence; (2) was incorrectly paid for sick time; (3) had not received back pay "effective end of January 2011" that he was due to receive; (4) had not received payment for vacation time he was due to receive; and (5) must be "zeroed out" before he could receive payment, similar to "house-closing-checks passing back and forth." The email also directed plaintiff to tender to Keen a check payable to the Cook County treasurer in the amount of $76,776.14. Keen indicated that Cook County would then issue a check to plaintiff representing the payments due him as described in the email.

¶ 8    On November 7, 2011, plaintiff issued a check payable to the Cook County treasurer in the amount of $76,776.14. He also issued a second check in the amount of $12,050.15 for retroactive insurance coverage. On December 14, 2011, Cook County issued a check payable to plaintiff for back pay due him in the amount of $53,774.09.

¶ 9    On November 11, 2011, after plaintiff resigned and before Cook County issued the check for back pay, Johnson authored and published an article through NBCChicago.com entitled, "Cook County Doc Gets Big Payout For No Work," accompanied by an online video segment. Plaintiff attached a copy of the article as an exhibit to the verified second amended complaint. The article states in relevant part:

> "A former Stroger Hospital doctor was given checks amounting to six figures with no work to show for it.
>
> The revelation has pushed Cook County's independent Inspector General to look into whether the issuances were accidental or intentional; a huge, one-time oversight or standard practice, an NBC Chicago/Better Government Association investigation has found.
>
> * * *
>
> 'All I wanted was to get out,' said orthopedic surgeon Dr. James Kapotas, who spent 12 years at the hospital. 'I was originally going to resign, but they said, "Take a leave of absence."[ ]' By all appearances, it would have been a lucrative leave.
>
> Between April and August of this year the BGA and NBC Chicago have learned Dr. Kapotas was being paid tens of thousands of dollars by the hospital–[*sic*] and doing no work.
>
> Payroll records show Kapotas was paid more than $100,000 ***. A pay code indicates he was compensated for unused sick days.
>
> But under hospital policy, no employee is allowed to be paid for either unused sick time or a personal leave of absence.
>
> 'We were able to find that there was a clerical error made and that there was, in fact, a former employee incorrectly paid on a leave of absence,' said Marisa Kollias, a spokeswoman for the hospital system.
>
> * * *
>
> Kapotas is now working again. He's in private practice with Central Indiana Orthopedics, where he declined an on-camera interview. He answered questions about his Stroger paychecks via telephone only.
>
> 'I don't go looking at my checking account,' he said. 'I do direct deposit. I don't have a boat. I don't have three wives. There's no intent to defraud the county.'

In the words of the hospital spokeswoman, it was all a 'big clerical error.'

Still, it was only after an inquiry into the story that hospital administrators launched an investigation into it.

Kapotas has since paid back the money that wasn't rightfully his. A Tuesday delivery at the suburban home of Kapotas' department chairman at Stroger, Dr. Richard Keen, included a formal letter of resignation and a check.

Kollias confirmed that Kapotas 'paid back everything' and insisted the incident was isolated.

Cook County Inspector General Pat Blanchard is in the process of determining if that's true and how the mistake originally happened.

Kapotas and others have already been interviewed."[4]

¶ 10    Plaintiff alleged the article stated that he "received money for doing no work when, in fact, [he] was incorrectly paid during an approved leave of absence." The article did not explain that Cook County owed plaintiff in excess of $50,000 when the article was published. The article also states that plaintiff was offered an on-camera interview, but neither Johnson nor any representative from WMAQ interviewed plaintiff about the incident.

¶ 11    On November 16, 2011, the BGA and Rehkamp authored and published an article through the Sun-Times entitled, "Cook County doctor overpaid $80,000 while on leave." Plaintiff attached a copy of the article as an exhibit to the verified second amended complaint. The article states in relevant part:

"Many doctors at the Cook County Health and Hospital System work long hours and difficult shifts for relatively modest pay compared with the private health-care industry. But one longtime county physician got a big bonus earlier this year: [h]e was paid an extra $80,000 while on a personal leave of absence that was supposed to be unpaid, the Better Government Association has learned.

Prompted by inquiries from the BGA, county officials are trying to determine whether the additional taxpayer-funded pay given to Dr. James Kapotas was an isolated error or if others working for the county's financially strapped health system have gotten money they weren't entitled to.

Kapotas has not been accused of wrongdoing, and he insists he didn't even know he had been overpaid.

After the BGA raised questions, he formally resigned from his county post and cut a check, refunding the estimated $80,000 that he was wrongly paid over a roughly four-month stretch.

'Look, all I did was ask for a leave of absence,' said Kapotas, an orthopedic surgeon who took a leave from the county in late April and currently is working in central Indiana. 'The people in payroll made a mistake.'

Marisa Kollias, a spokeswoman for the county health system, echoed that assertion, calling the situation 'a big clerical error.'

_____

[4]The articles at issue in this appeal are not reprinted in their entirety in this opinion, but include the allegedly defamatory material and those portions of the articles necessary to our analysis of the issues raised by the parties.

'At this time, the investigation reveals no criminal intent on the part of Cook County Health and Hospital System staff,' Kollias said.

But the county inspector general is continuing to investigate ***."

¶ 12    The verified second amended complaint quotes the first paragraph of the article and the paragraph reporting that plaintiff resigned and repaid the estimated $80,000, then alleges "[t]he article does not state that Dr. Kapotas paid the money back so that the error could be corrected and Cook County could pay [him] the money it owed him." Rehkamp informed plaintiff that he would contact plaintiff prior to publishing the article, but he failed to contact plaintiff. Rehkamp did not wait for the results of the Cook County inspector general's (Inspector General) investigation before publishing the story.

¶ 13    On May 7, 2012, Johnson authored and published a BGA and "Unit 5" report entitled, "Double Dipping Doctor Still on Inspector General's Radar." Plaintiff attached a copy of the article as an exhibit to the verified second amended complaint. The article states in relevant part:

"The Cook County Inspector General urged disciplinary action against a top doctor and two others at Cook County Hospital, as a result of a Unit 5 and Better Government Association investigation into another doctor who received nearly $90,000.00 in pay–[sic] even though he no longer worked at the hospital ***.

Last November, Unit 5 and the B.G.A. revealed that a veteran orthopedic surgeon at Cook County Hospital, Dr. James Kapotas, took a leave of absence from the hospital in April of 2011, but stayed on the hospital payroll through August of that year, receiving approximately $1,200.00 a day in taxpayer money. This was despite the fact that Dr. Kapotas had set up a new full-time private practice in Anderson, Ind.

At the time, Dr. Kapotas told Unit 5: 'I don't go looking at my checking account. I do direct deposit. I don't have a boat. I don't have three wives; I'm not some nephew of a county commissioner who enjoys doing nothing. There's no intent to defraud the county.'

Hospital spokesman [sic] Marisa Kollias said at the time that the payments were a result of a 'big clerical error.' She conceded, however, that Dr. Kapotas did not pay back the money until the week Unit 5 aired its story last fall.

* * *

Now Cook County Inspector General Pat Blanchard has determined that Dr. Kapotas 'continued to receive a full time County salary while actively employed elsewhere.' The I.G.'s report says the payments were 'improper' and that there was 'negligence' on the part of three hospital employees, including Dr. Richard Keen, who was Dr. Kapotas' supervisor at Cook County Hospital. The I.G. report also recommends 'disciplinary action' and 'policy training' to keep this from happening again.

Meanwhile, the anonymous hospital source who first told Unit 5 and the B.G.A. about Dr. Kapotas' extra paychecks has received a letter from Cook County Hospital, suspending him from his job there and banning him from the premises."

¶ 14    Plaintiff alleged the article did not offer any explanation or context for the use of the term "double dipping" or the phrase "still on the Inspector General's radar." Plaintiff also alleged the informant provided the defendants with information that could only have been obtained

- 5 -

from his private personnel/payroll or human resource records. Plaintiff further alleged that defendants published this information with direct knowledge and willful disregard of the fact that the information was protected from public disclosure and could not have been legally obtained by the informant. In addition, plaintiff alleged he could not have been "double dipping" because he was not being paid by Stroger Hospital on May 7, 2012. Moreover, plaintiff alleged that he was not under investigation by the Inspector General on May 7, 2012.

¶ 15 Lastly, Johnson coauthored an article with Rehkamp, which was also published on May 7, 2012, entitled, "County Watchdog Slams Hospital for Doc's Double-Dipping Ways." The article, attached as an exhibit to the verified second amended complaint, states in relevant part:

"The Cook County Health and Hospital System is being urged by the county's inspector general to take disciplinary action against one of its top doctors and two other employees following a Better Government Association/NBC5 [*sic*] investigation reported last November.

In that report, the BGA and NBC5 revealed that a veteran county orthopedic surgeon, Dr. James Kapotas, was paid almost $90,000 in taxpayer money last summer even though he was no longer on staff. Or as the Cook County IG later put it, he 'continued to receive a full time county salary while actively employed elsewhere.' The 'elsewhere' is in central Indiana where Kapotas now is in private practice.

'I don't go looking at my checking account,' Kapotas told the BGA last fall. 'I do direct deposit. I don't have a boat. I don't have three wives .... [*sic*] There's no intent to defraud the county.'

Kapotas paid back the money the week the story aired on television.

Now, in the wake of the BGA/NBC5 probe, the IG released a report calling the payments to Kapotas 'improper' and saying there was 'negligence' on the part of three hospital employees–including Dr. Richard Keen, Kapotas' supervisor at Stroger Hospital. In addition, the IG recommended 'disciplinary action' and 'policy training' so this type of incident doesn't happen again.

But now the original tipster on the story has been placed on paid leave.

Gerald Cotton, a hospital employee who first told the BGA about the extra paychecks Kapotas was pocketing, was sent a letter suspending him from his job and banning him from the hospital. The letter alleged Cotton threatened another hospital worker, which Cotton denies."

Plaintiff alleged this article similarly lacked explanation for the term "double dipping" and was based on information protected from public disclosure.

¶ 16 The verified second amended complaint includes 25 counts, asserting 5 causes of action against each of the five defendants. Count I sounded in defamation *per se*, asserting that the three articles authored or coauthored by Johnson displayed a reckless disregard for the veracity of the statements contained therein, accused plaintiff of theft and embezzlement, of lacking integrity in his employment duties, and imputed a lack of ability or otherwise harmed plaintiff in the medical profession. Count II sounded in defamation *per quod*, alleging that plaintiff could no longer expect to form valid relationships with patients and potential employers following the publication of Johnson's articles, proximately resulting in present and future damages. Count III sounded in false-light invasion of privacy, alleging Johnson acted with actual malice in publishing articles that were inaccurate and incomplete regarding the

repayment of funds, and highly offensive in their insinuations of wrongdoing by plaintiff. Count IV sounded in tortious interference with business expectancy, alleging that in March 2012, a recruiter contacted plaintiff regarding a position with the Indiana University Health Hospital System, but plaintiff did not receive an interview after the recruiter inquired about one of Johnson's articles, despite being fully qualified for the position. Plaintiff also alleged he could no longer expect to form valid relationships with patients and potential employers following the publication of Johnson's articles, proximately resulting in present and future damages. Count V sounded in the public disclosure of private facts, alleging Johnson's articles were published on WMAQ's highly trafficked website and offensively insinuated wrongdoing by plaintiff in an improper attempt to make a clerical error seem newsworthy.

¶ 17    Counts VI through X of the verified second amended complaint alleged the same causes of action against WMAQ for publishing Johnson's articles through its website. Counts XI through XV alleged similar causes of action against Rehkamp regarding the two articles he authored or coauthored (although count XIV, asserting tortious interference with business expectancy, only refers to the article published on November 16, 2011). Counts XVI through XX alleged similar causes of action against the BGA for publishing all four articles on its highly trafficked website. Counts XXI through XXV alleged similar causes of action against the Sun-Times regarding the November 16, 2011, article entitled, "Cook County doctor overpaid $80,000 while on leave," which was published on the highly trafficked Sun-Times website.

¶ 18    On June 11, 2013, the defendants filed motions to dismiss the verified second amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)).[5] The defendants argued: (1) plaintiff failed to identify any false statements in their articles; (2) the articles were substantially true; (3) the articles did not impute that plaintiff committed a crime, or lacked professional integrity or ability; (4) the articles could be reasonably innocently construed; (5) plaintiff failed to plead facts establishing actual malice; (6) plaintiff failed to plead special damages with particularity; (7) plaintiff failed to plead a valid business expectancy; (8) plaintiff failed to plead that the defendants intended to interfere with a business expectancy; (9) the payroll and salary data of Cook County employees is a matter of public record; and (10) the subject of the articles was a matter of public interest and concern.

¶ 19    On July 2, 2013, plaintiff filed a response to the defendants' motions to dismiss the verified second amended complaint. Plaintiff contended that the defendants' arguments regarding the truth of the articles, first amendment privileges, and the innocent construction rule were all affirmative defenses that could not be raised in a motion to dismiss for failure to state a claim. He also argued the statements that "[a] former Stroger Hospital doctor was given checks amounting to six figures with no work to show for it" and "Dr. Kapotas was being paid tens of thousands of dollars by the hospital–and doing no work" were defamatory *per se* because they imputed that he committed a crime or lacked integrity. Plaintiff similarly argued the headline, "Cook County doctor overpaid $80,000 while on leave" was false because he was owed $53,774.09 for back pay. He additionally argued that while he was not accused of wrongdoing,

_____

[5]The BGA's motion adopted in full the arguments presented by the remaining defendants in coordinated motions and briefs submitted to streamline the proceedings and avoid duplication. The Sun-Times' memorandum in support of its motion to dismiss does not appear in the record on appeal.

the phrase "the county's inspector general is continuing to investigate" implied he was the subject of a criminal investigation. According to plaintiff, the articles referring to him as "double dipping" were false because they misstated the nature of the overpayments and plaintiff was merely the unknowing beneficiary of a clerical error. Also, the headline stating that plaintiff was "still on the Inspector General's radar" again implied that plaintiff was the subject of the investigation and thus imputed that he committed a crime, or lacked integrity or ability in his profession.

¶ 20   In addition, plaintiff argued that if the innocent construction rule could be raised in a section 2-615 motion, it would not apply to this case because the defamatory construction was far more reasonable. He also argued he sufficiently pleaded actual malice by pleading the defendants acted with knowledge of the falsity of the articles and with reckless disregard of the facts. Regarding the claims of defamation *per quod*, plaintiff further argued he alleged special damages because: (1) he was forced to resign from Stroger Hospital; and (2) a recruiter stopped contacting him due to the publication of the articles.

¶ 21   Plaintiff additionally maintained he stated a cause of action for false-light invasion of privacy, because the court was required to view his allegations in the light most favorable to him, rather than defendants' interpretation of his allegations. Moreover, plaintiff argued his claim of tortious interference with business expectancies was based on valid relationships with: (1) Stroger Hospital; (2) his recruiter; (3) other potential employers; and (4) potential patients. He claimed that defendants' argument that there was no intent to interfere was absurd, asserting the only reason to publish the articles was to induce Stroger Hospital to terminate its relationship with him. Plaintiff also claimed the articles published on defendants' websites were followed by reader comments that established the articles defamed the plaintiff. Lastly, plaintiff argued that whether the articles involved a matter of public concern was an affirmative defense defendants could not raise in a section 2-615 motion to dismiss.

¶ 22   On August 2, 2013, defendant, the Sun-Times, filed a reply in support of its motion to dismiss the verified second amended complaint, arguing that substantial truth and innocent construction were issues Illinois appellate courts had decided as a matter of law when considering dismissals under section 2-615 of the Code. The Sun-Times also reiterated arguments presented in the defendants' motions to dismiss.[6]

¶ 23   On September 6, 2013, the circuit court conducted a hearing on defendants' motions to dismiss the verified second amended complaint. On November 20, 2013, the circuit court entered a memorandum ruling and order granting defendants' motions to dismiss the verified second amended complaint with prejudice. The circuit court ruled: (1) plaintiff failed to establish any false statements in the articles at issue; (2) the articles did not impute that plaintiff committed a crime, or lacked professional integrity or ability; (3) plaintiff failed to adequately allege the defendants acted with actual malice; (4) the articles could be reasonably innocently construed; (5) plaintiff failed to adequately allege the special damages required to state a claim for defamation *per quod*; (6) plaintiff failed to allege falsity, actual malice, or special damages required to state a claim for false-light invasion of privacy; (7) plaintiff failed to allege a valid

---

[6]The reply filed by the Sun-Times states that it adopted and incorporated "the legal arguments and citations in its co-defendants' reply brief in support of their motion to dismiss as they apply to the Sun-Times report." The record on appeal does not include any reply filed by the defendants other than the Sun-Times.

business expectancy or the defendants' intent to interfere with said expectancy required to state a claim for tortious interference; and (8) plaintiff failed to allege private facts required to state a claim for public disclosure of private facts, adding that the subject of the articles was also a matter of public concern.

¶ 24 On December 20, 2013, plaintiff filed a motion to reconsider the circuit court's dismissal of the verified second amended complaint. The circuit court on January 14, 2014, entered an order denying the motion to reconsider. On February 13, 2014, plaintiff filed a timely notice of appeal to this court.

¶ 25                                                  ANALYSIS

¶ 26 On appeal, plaintiff argues the circuit court erred in denying his verified second amended complaint. "A trial court may grant a section 2-615 motion to dismiss a complaint that does not contain sufficient allegations of fact to state a cause of action." *Shaker & Associates, Inc. v. Medical Technologies Group, Ltd.*, 315 Ill. App. 3d 126, 133 (2000). A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the complaint by alleging defects on its face. *Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 21. "In ruling on a section 2-615 motion, we accept as true all well-pleaded facts in the complaint and all reasonable inferences therefrom." *Id*. "The critical inquiry is whether the allegations of the complaint, when construed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted." *Id*. We review *de novo* an order granting a section 2-615 motion to dismiss. *Clark*, 2011 IL 108656, ¶ 21; *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 27 When ruling on a section 2-615 motion, "only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record may be considered." *Pooh-Bah Enterprises, Inc.*, 232 Ill. 2d at 473. "[A] plaintiff may not rely on mere conclusions of law or fact unsupported by specific factual allegations." *Id*. Generally, "[a]n exhibit attached to a complaint becomes part of the pleading for every purpose, including the decision on a motion to dismiss. [Citations.] Where an exhibit contradicts the allegations in a complaint, the exhibit controls. [Citation.]" *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 18. We observe, however, that a defamation claim typically alleges that statements in articles attached as exhibits are false. *Davis v. Keystone Printing Service, Inc.*, 111 Ill. App. 3d 427, 433-34 (1982). Thus, a defamation claim cannot be dismissed based solely on the unchallenged, nondefamatory statements in an article, absent corroboration. See *id*. (exhibits could not form sole basis for finding the plaintiff was a public figure when considering dismissal under prior section 48 of the Code (Ill. Rev. Stat. 1979, ch. 110, ¶ 48)).

¶ 28 The verified second amended complaint includes 25 counts, asserting 5 causes of action against each of the five defendants, involving the four published articles. We analyze each cause of action in turn to determine whether the circuit court erred in dismissing the individual counts addressing specific published articles.

Defamation

¶ 30     "The defamation action provides redress for false statements of fact that harm reputation." *Brennan v. Kadner*, 351 Ill. App. 3d 963, 968 (2004). "To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). "A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him." *Id.*

¶ 31     "Statements may be considered defamatory *per se* or *per quod.*" *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10 (1992). "Statements are considered defamatory *per se* when the defamatory character of the statement is apparent on its face; that is, when the words used are so obviously and materially harmful to the plaintiff that injury to his reputation may be presumed." *Id.* "Statements are considered defamatory *per quod* if the defamatory character of the statement is not apparent on its face, and extrinsic facts are required to explain its defamatory meaning." *Id.* Here, plaintiff asserts the articles published by the defendants were defamatory both *per se* and *per quod*. Prior to considering the specific theories of defamation, however, we address the defendants' argument that their articles did not contain false statements.

¶ 32     Falsity

¶ 33     The circuit court dismissed the defamation counts of the verified second amended complaint in part because plaintiff failed to establish any false statements in the articles at issue. Plaintiff argues that truth is an affirmative defense to a defamation claim and the circuit court erred in considering an affirmative defense in dismissing the claim under section 2-615 of the Code. "An affirmative defense is properly asserted in a section 2-615 motion only if the defense is apparent from the face of the complaint." *R&B Kapital Development, LLC v. North Shore Community Bank & Trust Co.*, 358 Ill. App. 3d 912, 921 (2005). "Raising such defenses in a section 2-615 motion would completely contradict the purpose of bringing such a motion, where the movant is expressly challenging the sufficiency of the complaint itself." *Becker v. Zellner*, 292 Ill. App. 3d 116, 122 (1997).

¶ 34     This court has recognized "substantial truth" as an affirmative defense to a defamation action. See, *e.g.*, *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 424 (1998). Our supreme court, however, has repeatedly held falsity is an element of the defamation plaintiff's cause of action. *E.g.*, *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300 (2001) (and cases cited therein). We are required to follow the decisions of the Illinois Supreme Court. *E.g.*, *Pyle v. City of Granite City*, 2012 IL App (5th) 110472, ¶ 19. Accordingly, regardless of whether "substantial truth" also may be an affirmative defense to a defamation action, we must address whether plaintiff sufficiently alleged any false statements in the articles published by the defendants.

¶ 35     "Cook County Doc Gets Big Payout For No Work"

¶ 36     The verified second amended complaint attached the articles published by the defendants as exhibits, and the counts alleging defamation do not quote or otherwise identify specific statements in the articles as false. Plaintiff argues that the headline, "Cook County Doc Gets

Big Payout For No Work," was false because he was otherwise entitled to the payments at some point in time, albeit not during his leave of absence. Initially, we observe that the headline, by itself, is not defamatory. Plaintiff must present facts establishing that the defendant made a false statement *about him*; the headline does not name him specifically. See *Green*, 234 Ill. 2d at 491; see also *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 96-97 (1996) (where a libelous *article* does not name the plaintiff, it should appear on the face of the complaint that persons other than the plaintiff and the defendant must have reasonably understood that the article was about the plaintiff). Thus, in order to determine whether the headline may be defamatory in this case, the text of the article must be considered.

¶ 37    In this instance, the text of the article reported, "Between April and August of this year the BGA and NBC Chicago have learned Dr. Kapotas was being paid tens of thousands of dollars by the hospital–[*sic*] and doing no work" for the hospital. In his complaint, plaintiff admitted he was paid tens of thousands of dollars by Stroger Hospital while he was not working there. The article also reported, "A pay code indicates he was compensated for unused sick days." In his complaint, plaintiff admitted Stroger's payments represented unused sick leave and vacation time. The article further reported that "under hospital policy, no employee is allowed to be paid for either unused sick time or a personal leave of absence." In his complaint, plaintiff admitted Stroger Hospital does not allow physicians to use sick time for nonmedical leaves of absence. We accept the allegations in the verified second amended complaint as true. *Clark*, 2011 IL 108656, ¶ 21.

¶ 38    Initially, we observe that sick and vacation pay are generally forms of compensation for periods of time when an employee is not working. Nevertheless, even assuming that plaintiff was entitled to compensation for some or all of his unused sick or vacation time at some time,[7] plaintiff alleged that he was not entitled to such compensation during his leave of absence. Accordingly, plaintiff has failed to demonstrate the article was false.

¶ 39                        "Cook County doctor overpaid $80,000 while on leave"

¶ 40    In the response to the motions to dismiss, plaintiff argued the headline, "Cook County doctor overpaid $80,000 while on leave" was false because he was owed $53,774.09 for back pay. Again, the headline did not identify plaintiff and thus we must also examine the text of the accompanying article. *Supra* ¶ 36. In this instance, the article reported plaintiff "was paid an extra $80,000 while on a personal leave of absence that was supposed to be unpaid." In his complaint, plaintiff admitted he was erroneously issued payments for untaken sick leave and vacation time during his leave of absence. We accept the allegation as true. *Clark*, 2011 IL 108656, ¶ 21. Thus, plaintiff has failed to establish the article was false, for the same reasons plaintiff failed to prove the "Cook County Doc Gets Big Payout For No Work" article was false.

---

[7]In this regard we observe in passing that the verified second amended complaint alleged plaintiff received an email referring to back pay and vacation time not paid to plaintiff. The verified second amended complaint subsequently referred to Cook County issuing a check representing back pay to plaintiff, with no reference to vacation time. The verified second amended complaint further alleged that unused sick time has value because it can be added to a pension, but contained no specific allegations on this point.

¶ 41                             "Double Dipping"

¶ 42     Plaintiff also argued the articles referring to him as "double dipping" were false because they misstated the nature of the overpayments. The verified second amended complaint alleged these articles did not offer any explanation or context for the claim that plaintiff was double dipping. On appeal, plaintiff observes the term "double dipping" has been defined as "obtain[ing] an income from two different sources, typically in an illicit way." Oxford Dictionary of English 525 (3d ed. 2010). "Illicit" has been defined as "forbidden by law, rules, or custom." Oxford Dictionary of English 872 (3d ed. 2010). Similar to the first two articles, the headlines using the term did not identify plaintiff and thus we must also examine the text of the accompanying articles. *Supra* ¶ 36.

¶ 43     In this case, the articles using the term "double dipping" reported that plaintiff was in private practice in Indiana during the time period of the erroneous payments. Thus, the articles that referred to "double dipping" explained the use of the term. The text controls over the contrary allegation in the verified second amended complaint. *Gagnon*, 2012 IL App (1st) 120645, ¶ 18. Although the articles using the term were published after the improper payments ceased, the use of the present-tense term "double dipping," when read in context, did not indicate the payments were continuing. Indeed, plaintiff's repayment of the funds was reported in the articles. Given the allegations of the verified second amended complaint, plaintiff cannot establish that the term "double dipping" was false in this instance.


¶ 44                   The Inspector General's Investigation

¶ 45     Plaintiff further argues that on May 7, 2012, he was not the subject of any pending investigation by the Inspector General. The articles published by the defendant, however, did not assert that plaintiff was the subject of the investigation. One article stated that plaintiff was "still on the Inspector General's radar," but that article went on to report that the Inspector General was urging disciplinary action against three hospital employees (none of which was plaintiff) as a result the improper payments to plaintiff. Thus, the colloquial use of the term "radar" was not false when read in context of the article.


¶ 46                           Payroll Information

¶ 47     Lastly, plaintiff complained that on May 7, 2012, his payroll information was not readily available to the public. This allegation does not establish that the defendants' articles were false.

¶ 48     In sum, the circuit court did not err in ruling that the verified second amended complaint failed to sufficiently allege false statements in the articles published by the defendants. The lack of false statements would be a sufficient basis for dismissing the defamation claims in the verified second amended complaint. The circuit court, however, recited further reasons to dismiss the claims of defamation *per se* and defamation *per quod* in the verified second amended complaint. We now turn to consider those additional bases for the dismissal of the defamation claims.


¶ 49                           Defamation *Per Se*

¶ 50     Illinois recognizes five categories of statements that are considered defamatory *per se*: "(1) words that impute a person has committed a crime; (2) words that impute a person is infected

with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Green*, 234 Ill. 2d at 491-92. "Although a complaint for defamation *per se* need not set forth the allegedly defamatory words *in haec verba*, the substance of the statement must be pled with sufficient precision and particularity so as to permit initial judicial review of its defamatory content." *Id*. at 492. "The preliminary construction of an allegedly defamatory statement is a question of law, and our review therefore is *de novo*." *Id.*

¶ 51 Plaintiff argues the articles published by defendants accused him of theft and embezzlement, of lacking integrity in his employment duties, and imputed a lack of ability or otherwise harmed him in the medical profession. To constitute defamation *per se* based on imputing the commission of a crime, the crime must be an indictable one, involving moral turpitude and punishable by death or imprisonment, not by a fine. *Jacobson v. Gimbel*, 2013 IL App (2d) 120478, ¶ 27. Although the words do not need to meet the technical requirements necessary for an indictment, they must fairly impute the commission of a crime. *Id*. A statement that an individual has been interviewed by police does not impute the commission of a crime by that person. *Hurst v. Capital Cities Media, Inc*., 323 Ill. App. 3d 812, 817 (2001). A statement that an individual has been arrested or charged with an offense is not evidence of guilt in that offense and thus does not impute the commission of a crime. See *Adams v. Sussman & Hertzberg, Ltd*., 292 Ill. App. 3d 30, 47 (1997) (and cases cited therein). Similarly, the use of a term which has a broader, noncriminal meaning does not impute the commission of a crime. See *id*. (citing *Owen v. Carr*, 134 Ill. App. 3d 855 (1985), *aff'd*, 113 Ill. 2d 273 (1986)).

¶ 52 In this case, plaintiff asserts that the articles published by the defendants impute the crimes of theft and embezzlement. The articles, however, read in their entirety, do not expressly accuse plaintiff of either offense, or claim that he has been arrested with regard to the underlying incident. The article entitled "Cook County Doc Gets Big Payout For No Work" reported that plaintiff "was given checks amounting to six figures with no work to show for it," but does not claim this occurred as the result of criminal acts by plaintiff.

¶ 53 The Sun-Times article entitled "Cook County doctor overpaid $80,000 while on leave" included the statement that "the county's inspector general is continuing to investigate." Assuming for the sake of argument that this statement, outside the context of the article, implied that plaintiff was under investigation, the statement does not claim the Inspector General was conducting a criminal investigation or impute the commission of an offense. See *Adams*, 292 Ill. App. 3d at 47.

¶ 54 Plaintiff objects to the headlines "Double Dipping Doctor Still on Inspector General's Radar" and "County Watchdog Slams Hospital for Doc's Double-Dipping Ways." As previously noted, the term "double dipping" has been defined as "obtain[ing] an income from two different sources, typically in an illicit way." Oxford Dictionary of English 525 (3d ed. 2010). "Illicit" has been defined as "forbidden by law, rules, or custom." Oxford Dictionary of English 872 (3d ed. 2010). Another common definition of a "double-dipper" is "a person who collects both a government pension and a government salary," without any reference to the legality of the practice. Merriam-Webster's Collegiate Dictionary 374 (11th ed. 2006). Accordingly, the term has a broader, noncriminal meaning that does not impute the

commission of an indictable crime. See *Jacobson*, 2013 IL App (2d) 120478, ¶ 27; *Adams*, 292 Ill. App. 3d at 47. Indeed, the definition plaintiff offers does not necessarily imply *criminal* behavior. Plaintiff also maintains the phrase "Still on Inspector General's Radar" implies that he is personally under investigation, but this argument fails for the reasons already stated. See *supra* ¶ 53 (citing *Adams*, 292 Ill. App. 3d at 47).

¶ 55        Plaintiff further argues the articles impute that he lacks integrity in performing his employment duties, or lacks the ability to fulfill his professional responsibilities. As previously noted, statements that prejudice a party, or impute lack of ability, in his or her trade, profession or business are considered defamatory *per se*. *Kolegas*, 154 Ill. 2d at 10; see *Vicars-Duncan v. Tactikos*, 2014 IL App (4th) 131064, ¶ 33. For example, in *Vicars-Duncan*, the appellate court ruled that claiming an assistant State's Attorney bullied and told untruths to an individual charged with a lane-change violation did not obviously accuse the prosecutor of misconduct or of lacking integrity in performing her job. *Id*. Similarly, in *Powers v. Delnor Hospital*, 148 Ill. App. 3d 844 (1986), this court ruled that comments directed towards a plaintiff's personality conflicts with his or her coworkers did not address the plaintiff's knowledge and ability to care for patients as a nurse, and thus would not be defamatory *per se*. *Id*. at 847 (discussing *Heying v. Simonaitis*, 126 Ill. App. 3d 157 (1984)).

¶ 56        In this case, plaintiff does not identify any statement in any of the articles that impute that plaintiff lacks ability as a medical professional or violated any rule of medical ethics. Thus, plaintiff has failed to establish any statements in the articles which are defamatory *per se*. *Vicars-Duncan*, 2014 IL App (4th) 131064, ¶ 33.

¶ 57                                          Innocent Construction
¶ 58        Furthermore, it is "well settled that, even if an alleged statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is reasonably capable of an innocent construction." *Green*, 234 Ill. 2d at 499. "Under the 'innocent-construction rule,' a court must consider the statement in context and give the words of the statement, and any implications arising from them, their natural and obvious meaning." (Emphasis omitted.) *Id*. "If the statement may reasonably be innocently interpreted, it cannot be actionable *per se*." *Id*. at 500. " 'There is no balancing of reasonable constructions ***.' " *Id*. (quoting *Mittelman v. Witous*, 135 Ill. 2d 220, 232 (1989)). "At the same time, when the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement." *Green*, 234 Ill. 2d at 500. "When applying the innocent construction rule to a story or column ***, courts consider the text of the entire article and the headline as one document when considering the context and meaning of the purported article." *Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 135 (2007) (and cases cited therein). "Whether a statement is reasonably susceptible to an innocent interpretation is a question of law for the court to decide." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 90 (1996).[8]

---

    [8]We note that in *Bryson*, our supreme court ruled the innocent construction rule could not be the subject of a section of a section 2-615 motion and treated it as affirmative matter raised under section 2-619 of the Code, where the plaintiff did not attach a copy of the article to her complaint as an exhibit or recite the article within the complaint. *Bryson*, 174 Ill. 2d at 91-92. In this case, plaintiff attached the articles at issue to her complaint, thus incorporating them into the pleading. *Gagnon*, 2012 IL App (1st)

- 14 -

¶ 59                    "Cook County Doc Gets Big Payout For No Work"

¶ 60       In this case, even assuming for the sake of argument that the statements identified by plaintiff were defamatory *per se*, each of the articles when read in their entirety may reasonably be innocently interpreted. The article headlined "Cook County Doc Gets Big Payout For No Work": (1) noted the incident was under investigation to determine whether the payments were accidental or intentional; (2) quoted plaintiff stating that the leave of absence was the idea of Stroger Hospital, explaining he had not regularly examined his checking account, and declaring there was no fraudulent intent; (3) quoted a Stroger Hospital spokesperson characterizing the incident as a "big clerical error"; and (4) reported plaintiff had repaid the funds at issue. Consequently, the article could be reasonably construed as reporting the incident consistently with the facts as alleged by plaintiff in his verified second amended complaint.

¶ 61                    "Cook County doctor overpaid $80,000 while on leave"

¶ 62       Similarly, the article headlined "Cook County doctor overpaid $80,000 while on leave," read in its entirety, reported: (1) plaintiff had not been accused of wrongdoing and insisted he did not know he was overpaid; (2) plaintiff characterized the payments as a mistake by Stroger Hospital; (3) a county health system spokesperson characterized the situation as a "big clerical error"; and (4) plaintiff was "mistakenly compensated" for unused sick and vacation time. The article thus could also be reasonably construed as reporting the incident consistently with the facts as alleged by plaintiff in his verified second amended complaint.

¶ 63                    "Double Dipping Doctor Still on Inspector General's Radar"

¶ 64       The article headlined "Double Dipping Doctor Still on Inspector General's Radar" reported that the Cook County Inspector General determined plaintiff improperly continued to receive a salary while actively employed elsewhere. The article also repeated the explanations offered by Kapotas and the Stroger Hospital spokesperson. The article further reported that the Inspector General's report found negligence on the part of three Stroger Hospital employees, but did not claim plaintiff was one of those employees. The article thus could be reasonably construed as describing the Inspector General's report finding negligence on the part of the hospital without any claim of criminal or unethical behavior by plaintiff.

¶ 65                    "County Watchdog Slams Hospital for Doc's Double-Dipping Ways"

¶ 66       Lastly, the article "County Watchdog Slams Hospital for Doc's Double-Dipping Ways" may be read as primarily critical of Stroger Hospital, even in its headline. Read in its entirety, the article reported: (1) the explanation offered by plaintiff; (2) the repayment of the funds by plaintiff; and (3) the Inspector General's report found negligence on the part of three Stroger Hospital employees, but did not claim plaintiff was one of those employees. Moreover, the article (similar to the "Double Dipping Doctor Still on Inspector General's Radar" article) reports on allegations that Stroger Hospital retaliated against the person who informed some of

120645, ¶ 18. Accordingly, the innocent construction rule may be asserted under section 2-615 of the Code in this case. See, *e.g.*, *Green*, 234 Ill. 2d at 499.

the defendants about the incident. The defendants did not report that plaintiff had any involvement regarding the alleged retaliation.

¶ 67 In sum, none of the statements plaintiff identified in his verified second amended complaint fall within the defamatory *per se* category. The articles may be reasonably read as critical of Stroger Hospital for issuing payments to plaintiff during his leave of absence without imputing any crime to plaintiff, or any lack of integrity or ability in his professional duties. Accordingly, the circuit court did not err in relying in part on the innocent construction rule to dismiss the claims of defamation *per se* in counts I, VI, XI, XVI and XXI of the verified second amended complaint.

¶ 68                                                    Defamation *Per Quod*

¶ 69 Statements are defamatory *per quod* under two circumstances: (1) where the defamatory character of the statement is not apparent on its face and resort to extrinsic circumstances is necessary to demonstrate its injurious meaning; and (2) where the statement is defamatory on its face, but does not fall within one of the limited categories of statements that are actionable *per se*. *Bryson*, 174 Ill. 2d at 103. Unlike a defamation *per se* action, plaintiff must plead and prove special damages to recover for defamation *per quod*. *Id*.

¶ 70 For example, in *Barry Harlem Corp. v. Kraff*, 273 Ill. App. 3d 388 (1995), the plaintiff eye clinic, which advertised and performed no-stitch cataract surgery, alleged the defendant ophthalmologist defamed the plaintiff by publishing a commentary stating: (1) there were no current masked double blind published studies demonstrating any advantage of no-stitch over conventional surgery that uses stitches to close the wound; (2) the main advantage of no-stitch surgery was one of advertising; (3) a scientific study should be conducted to evaluate the alleged advantages of no-stitch, one stitch or multiple stitch procedures; and (4) the defendant saw no need to perform no-stitch surgery as it may have adverse effects on patients. See *id*. at 390-91. The plaintiff eye clinic alleged "that a double-blind study was impossible to perform, that other existing studies show the advantages of no-stitch surgeries, and that defendant was involved in a study regarding the benefits of the procedure." *Id*. at 394.

¶ 71 The *Barry Harlem* court found the plaintiff's allegations were insufficient to establish the defendant's commentary accused the plaintiff of deceptive or fraudulent practices. See *id*. at 394-95. The appellate court also ruled that plaintiff failed to sufficiently allege special damages, where the plaintiff's complaint stated: "Upon information and belief, [plaintiff] has lost patients who would have otherwise presented themselves for treatment at the [plaintiff eye clinic] but did not do so." (Internal quotation marks omitted.) *Id*. at 395. Accordingly, the appellate court held the circuit court properly dismissed the plaintiff's claim of defamation *per quod*. *Id*. See also *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416-17 (1996) (allegations that the plaintiff was damaged monetarily by losing gainful employment and wages and suffered great mental pain and anguish were insufficient to establish special damages resulting from allegedly defamatory comment); *Taradash v. Adelet/Scott-Fetzer Co.*, 260 Ill. App. 3d 313, 318 (1993) (allegations that because of the defamatory remarks by defendants, customers refused to deal with the plaintiff, that he was hindered from selling his product lines, and that he suffered lost commissions and income failed to allege special damages or to set forth sufficient facts to satisfy the *per quod* action).

¶ 72 In this case, plaintiff claims that each of the articles is defamatory on its face, even if statements in the articles do not fall within one of the limited categories of statements that are

actionable *per se*. Even assuming for the sake of argument, however, that the articles were defamatory, the relevant counts of the verified second amended complaint allege only that plaintiff "can no longer expect valid business relationships to form with patients and potential employers" after the publication of the articles. Accordingly, plaintiff failed to sufficiently allege the special damages necessary to maintain a cause of action for defamation *per quod*. *Anderson*, 172 Ill. 2d at 416-17; *Barry Harlem Corp.*, 273 Ill. App. 3d at 395; *Taradash*, 260 Ill. App. 3d at 318.

¶ 73      Plaintiff argues he sufficiently alleged special damages because: (1) he was forced to resign from Stroger Hospital; and (2) a recruiter stopped contacting him due to the publication of the articles. A careful reading of the verified second amended complaint, however, establishes that plaintiff did not allege either of these purported facts. The verified second amended complaint alleged that plaintiff resigned on November 5, 2011, prior to the publication of any of the articles published by the defendants. The verified second amended complaint also alleged that a recruiter contacted plaintiff regarding a position with the Indiana University Health Hospital System, but did not receive an interview after the recruiter inquired about one of Johnson's articles, despite being fully qualified for the position. Plaintiff did not allege that the recruiter stopped contacting him. Moreover, the failure to obtain an interview or further inquiries from a recruiter would not sufficiently establish defamation *per quod*. See *Anderson*, 172 Ill. 2d at 416-17 (allegations that the plaintiff was "damaged monetarily by losing gainful employment and wages" and that she "suffered great mental pain and anguish and incurred great expense for the treatment thereof" were insufficient to plead defamation *per quod* (internal quotation marks omitted)). Accordingly, the circuit court did not err in dismissing the claims of defamation *per quod* in counts II, VII, XII, XVII and XXII of the verified second amended complaint.

¶ 74                                   Ancillary Claims

¶ 75      Having determined that the circuit court did not err in dismissing the defamation claims in the verified second amended complaint, we turn to address the claims of false-light invasion of privacy, intentional interference with prospective economic advantage, and public disclosure of private facts. At the outset, we observe that the dismissal of the first two of these three claims was proper, based on the proper dismissal of the defamation claims. For example, where the plaintiff fails to state a cause of action for defamation *per se*, a count alleging false-light invasion of privacy based on the allegedly inherently defamatory statements must fail as well. See *Tuite v. Corbitt*, 358 Ill. App. 3d 889, 899 (2005), *rev'd on other grounds*, 224 Ill. 2d 490 (2006); *Harte v. Chicago Council of Lawyers*, 220 Ill. App. 3d 255, 263 (1991). Similarly, plaintiff acknowledges in his brief that accurate and proper statements cannot represent an *unjustified* interference with a plaintiff's prospective business expectancy. See *Voyles*, 196 Ill. 2d at 301. Nevertheless, we will examine the other grounds for dismissing these two claims before analyzing the dismissal of the counts alleging the public disclosure of private facts.

¶ 76                          False-Light Invasion of Privacy

¶ 77      Three elements are required to state a cause of action for false-light invasion of privacy: (1) the plaintiffs were placed in a false light before the public as a result of the defendants' actions; (2) the false light in which the plaintiffs were placed would be highly offensive to a reasonable

- 17 -

person; and (3) the defendants acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Kolegas*, 154 Ill. 2d at 17-18. In addition, "a claim for false-light invasion of privacy based on language, the defamatory meaning of which can be established only by reference to extrinsic facts, requires the pleading of special damages with particularity." *Schaffer v. Zekman*, 196 Ill. App. 3d 727, 736 (1990).

¶ 78   In this case, as previously noted, plaintiff failed to identify false statements in the articles published by the defendants. *Supra* ¶¶ 32-48. Plaintiff also failed to sufficiently allege the special damages necessary to maintain a cause of action for defamation *per quod*. *Supra* ¶¶ 72-73. For these reasons, the circuit court did not err in dismissing the claims of false-light invasion of privacy in counts III, VIII, XIII, XVIII and XXIII of the verified second amended complaint.

¶ 79                         Tortious Interference With Business Expectancy

¶ 80   "To state a cause of action for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson*, 172 Ill. 2d at 406-07. "The hope of receiving a job offer is not a sufficient expectancy." *Id*. at 408. The plaintiff must specifically identify the person with whom the plaintiff expected to contract and allege specific acts of interference. See *Citylink Group, Ltd. v. Hyatt Corp*., 313 Ill. App. 3d 829, 840 (2000). The focus of the analysis is not on the conduct of the person terminating the relationship, but on the conduct of the party inducing the breach or interfering with the expectancy. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998). "Moreover, to prevail on the claim, a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'–that the defendant has committed some impropriety in doing so." *Id*. at 485. A claim of intentional interference "must set forth facts which suggest that defendant acted with the purpose of injuring plaintiff's expectancies." *J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp*., 213 Ill. App. 3d 510, 515 (1991).

¶ 81   In this case, plaintiff alleged in a conclusory manner that the defendants intentionally and unjustifiably interfered with his business expectancies. Plaintiff alleged no facts from which it could be inferred that the defendants acted with the purpose of injuring plaintiff's expectancies. Plaintiff asserts on appeal that the defendants could have had no other purpose than to terminate his relationship with Stroger Hospital. The defendants, however, assert their articles were published for the purpose of exposing the improper payment made by Stroger Hospital. The lack of specific allegations that the defendants acted with the purpose of injuring plaintiff's expectancies is fatal to his claim of tortious interference with an economic expectancy. *Dowd & Dowd, Ltd.*, 181 Ill. 2d at 484; *J. Eck & Sons, Inc.*, 213 Ill. App. 3d at 515. Indeed, plaintiff's second amended verified complaint alleged only that he did not receive an interview for a position at the Indiana University Health Hospital System, which is not a sufficient expectancy. *Anderson*, 172 Ill. 2d at 408. Consequently, as previously noted, plaintiff failed to sufficiently allege the defendants published false statements about him, which defeats the assertion that the defendants' actions were unjustified. Accordingly, the

circuit court did not err in dismissing counts IV, IX, XIV, XIX and XXIV of the verified second amended complaint.

¶ 82                                     Publication of Private Facts

¶ 83          "The public disclosure of private facts is one branch of the tort of invasion of privacy." *Green v. Chicago Tribune Co.*, 286 Ill. App. 3d 1, 5 (1996). "To state a cause of action for the public disclosure of private facts, plaintiff must plead (1) the [defendant] gave publicity; (2) to her private, not public, life; (3) the matter publicized was highly offensive to a reasonable person; and (4) the matter publicized was not of legitimate public concern." *Green v. Chicago Tribune Co.*, 286 Ill. App. 3d 1, 5 (1996). The circuit court dismissed these counts of the verified second amended complaint because it concluded the facts published were not private and involved a matter of legitimate public concern.

¶ 84          The question of whether the articles published by the defendants publicized a matter of legitimate public concern is a proper subject for a section 2-615 motion to dismiss. See, *e.g.*, *Green*, 286 Ill. App. 3d at 9-11 (and cases discussed therein). " 'In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern.' " *Id.* at 11 (quoting Restatement (Second) of Torts § 652D, cmt. h, at 391 (1977)).

¶ 85          For example, "the receipt of State funds by physicians creates a public interest in the physicians' activities regarding the use of those funds." *Family Life League v. Department of Public Aid*, 112 Ill. 2d 449, 457 (1986). "[P]hysicians, as licensed professionals providing public services at the taxpayers' expense, at best have a limited privacy interest in this information, and the physicians' interest is decidedly outweighed by the public's interest." *Id.* (ruling state records statute required the disclosure of the names of providers of abortion services, the number of abortions performed, and the amounts paid for those services under the Medicaid program). " '[T]he public's right to know how and for what purposes public funds are spent is a matter of legitimate public concern, far outweighing any personal privacy right of those providers to whom public funds are disbursed.' " *Id.* at 458 (quoting *State ex rel. Stephan v. Harder*, 641 P.2d 366, 376 (Kan. 1982)).

¶ 86          In this case, the defendants reported on payments issued by Stroger Hospital to plaintiff. The articles published by the defendants reported that Stroger Hospital is part of the Cook County Health & Hospitals System and the payments to plaintiff involved public funds. The allegations in the verified second amended complaint, presumed to be true for the purposes of a section 2-615 motion to dismiss, establish the public funds were paid in violation of the Stroger Hospital policy. The issue of how and for what purposes Stroger Hospital disbursed funds to plaintiff is thus a matter of legitimate public concern. See *Family Life League*, 112 Ill. 2d at 458. Accordingly, the circuit court did not err in dismissing counts V, X, XV, XX, and XXV of the verified second amended complaint.

¶ 87                                   CONCLUSION

¶ 88         For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 89         Affirmed.